

SEP 3 0 2010

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CLYDE L. BENNETT,

    Plaintiff,

v.                            Civil Action No. 3:08cv498

R&L CARRIERS SHARED
SERVICES, LLC,
et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL (Docket Nos. 114 and 115).[1] The Defendants are: R&L Carriers Shared Services, LLC ("R&L"), Frank Dominic Finley ("Finley"), James Lee Bullard, Jr. ("Bullard"), and David John McGinnis, Sr. ("McGinnis"), (collectively "the Defendants"). If their motion is not granted, they seek a remittitur. For the reasons set forth below, the motion will be granted in part and denied in part.

---

[1] The two motions (Docket Nos. 114 and 115) are identical pursuant to the CM/ECF rule that requires "[a] filing user who prepares a single document that contains more than one motion for relief [to] file that document as many times as there are motions for relief[]." E.D. Va. ECF Policies & Proc. at 70 (Sept. 27, 2010). This Memorandum Opinion and the accompanying Final Judgment Order, therefore, dispose of both motions (Docket Nos. 114 and 115).

## I.  Factual Background

R&L operates a commercial shipping service that includes trucking transportation services.  In so doing, R&L maintains various trucking terminals across the United States, including a terminal in Colonial Heights, Virginia ("the Richmond Terminal"). In March 2006, Plaintiff Clyde Lawrence Bennett ("Bennett" or "the Plaintiff") was employed by R&L at the Richmond Terminal as the out-bound night shift supervisor earning $41,600 annually.  Trial Tr. at 241:8-15, 631:19-21.  In his capacity as supervisor, Bennett was responsible for supervising the dockworkers during the unloading and loading of truck trailers.  Trial Tr. at 241:17-18. At the time, Bennett had a money market account with Wachovia worth $81,222.48, Pl.'s Ex. 17 at 1, and an annuity worth $28,000, Trial Tr. at 618:12-14.

On March 3, 2006, thirteen laptop computers were shipped from R&L's Newark, New Jersey terminal to the Richmond Terminal en route to a final destination in Miami, Florida.  Trial Tr. at 371:1-3, 373:1-12.  The Richmond terminal was designated as a "break" terminal, meaning that the trailer would be opened in Richmond, and items would be moved from one trailer to another.  Trial Tr. at 373:12-15.

Conan Spangler ("Spangler"), who was employed by R&L as a dockworker in the Richmond Terminal, was working as a "breaker" on

2

March 3, 2006, meaning that he was responsible for unloading the inbound trailers. Trial Tr. at 373:16-22. Spangler unloaded the trailer that was supposed to contain the shipment of 13 laptop computers and marked, on the shipping manifest, that the shipment was a "no freight," thereby indicating that the laptops were not on the trailer. Trial Tr. at 373:22 - 374:1. Joseph Mitchell ("Mitchell"), who was also employed by R&L as a dockworker in the Richmond Terminal, was working as a "loader" on March 3, 2006, meaning that he was responsible for loading the outbound trailers. Trial Tr. at 374:4-7, 373:19-21. Mitchell indicated, in the shipping manifest, that he loaded the 13 laptop computers onto the Miami-bound trailer. Trial Tr. at 374:6-7. En route to Miami, the trailer stopped in Jacksonville, Florida at another "break" terminal, and the Jacksonville terminal discovered that the 13 laptop computers were not on the trailer. Trial Tr. at 374:10-14.

Two weeks later, on Friday, March 17, 2006, a shipment of six Hewlett Packard ("HP") tower computers arrived at the Richmond Terminal. Trial Tr. at 371:3-7, 376:25 - 377:6. Each of the HP computers was worth approximately $800 to $1,000. Trial Tr. at 133:14-16. These six computers had been "returned," not because the computers were themselves damaged, but because the "boxes were busted or crushed a little, and customers would not purchase th[em]." Trial Tr. at 377:4-8. An R&L employee placed the six computers on a skid, and the skid was placed in the middle of the

3

shipping dock in an area known as the "Overage, Shortage, and Damages" section, or "OS&D." Trial Tr. at 377:16-19. The OS&D area is an open area delineated by stanchions and rope. Trial Tr. at 443:3-7. On Sunday, March 19, 2006, three of the six computers were missing. Trial Tr. at 377:23-25.

Promptly thereafter, the manager of the Richmond Terminal, Finley, advised R&L's Director of Operations for the Southeastern United States, Bullard, that R&L was "missing some computers." Trial Tr. at 143:1-9, 138:6-7. Bullard already was in Richmond at the time assisting in the restructuring of R&L's northeast shipping line. Trial Tr. at 138:11-13. Once Bullard learned that there were possible missing computers, he directed Finley to "review the process" and "[g]o through [R&L's] OS&D checklist and verify if [R&L] could find the shipment within [the R&L] network, or if it had been cross delivered." Trial Tr. at 138:23 - 139:4. When that effort was unsuccessful, Bullard, on March 22, 2006, called McGinnis, R&L's regional security investigator, and informed him that computers were missing from two different shipments in the Richmond Terminal. Trial Tr. at 369:22 - 370:3, 371:1-4.

McGinnis, who had worked for 21 years with the Atlanta Police Department, was hired by R&L initially as a tractor trailer driver. Trial Tr. at 364:2-3, 365:3-14. After serving approximately two years as a driver, McGinnis was made the regional security investigator for the South, a position for which McGinnis received

4

no training from R&L.  Trial Tr. at 365:16-17, 366:8-9, 367:1-12.

Before 2006, McGinnis had been involved in 700 or more R&L investigations, about fifty percent of which were related to theft.  Trial Tr. at 369:8-14.

McGinnis arrived at the Richmond Terminal on Monday, March 27, 2006 at around 3:00 p.m.  Trial Tr. at 371:13-18, 425:22 - 426:1.[2] His purpose was to "look into a possible theft situation involving computers."  Trial Tr. at 372:16-18.  McGinnis began his investigation by discussing with Finley the specific circumstances surrounding the disappearance of the computers at the Richmond Terminal.  Trial Tr. at 376:1-2.  He then went through all of the relevant paperwork with Finley and decided that the freight at issue had not been shipped erroneously to another terminal.  Trial Tr. at 376:2-6.  Having determined that the freight was not misshipped, McGinnis asked Finley if he knew of someone who might have "a lot of computer knowledge," and Finley, based on "[w]ord of mouth from the [employees on the] dock," gave McGinnis three names, Spangler, Mitchell and another dockworker named David Lowrey

---

[2] It is unclear in the record, once McGinnis became involved, exactly which R&L personnel present at the Richmond Terminal on the days in question, if any, had the authority to influence or conclude McGinnis's investigation if they had so desired.  Bullard believed that "[he] had the authority to stop the investigation." Trial Tr. at 131:3-4.  McGinnis testified, however, that Bullard did not have any authority over his investigation.  Trial Tr. at 417:6-8.  There is no indication that Finley had, or believed he had, any authority over the investigation.

("Lowrey").[3]  Trial Tr. at 376:7-11; Pl.'s Ex. 2 at 4.  McGinnis
then began to interview various R&L employees as part of a
"preliminary 'fact finding' examination."  Trial Tr. at 302:24-25;
Pl.'s Ex. 2 at 3.

McGinnis was immediately suspicious of both Spangler and
Mitchell because of the inconsistencies in their shipping manifest
entries related to the March 3, 2006 shipment of laptops.  Trial
Tr. at 374:14-15, 374:20-21.  During McGinnis's first interview
with Spangler on Tuesday, March 28, 2006, Spangler was "real[ly],
real[ly] evasive" and "real[ly] arrogant."  Trial Tr. at 382:22-25,
383:10-13.  McGinnis interviewed Spangler a second time later that
evening because he "didn't like [Spangler's] responses on the first
interview," and McGinnis "was more intense with him" this second
time around.  Trial Tr. at 388:12-14, 386:9-13.  Both interviews

_____

[3] McGinnis initially testified at trial that Finley gave him
the names of Spangler, Lowrey, and *Bennett*. Trial Tr. at 376:7-11.
However, McGinnis later testified that this statement was not
correct because at least two of the names had to have been
Spangler's and *Mitchell's*. Trial Tr. at 423:14 - 424:1.
McGinnis's report also explains that "two of the [three]
individuals had direct contact with one of the missing shipments,"
indicating that two of the names had to have been Spangler's and
Mitchell's. Pl.'s Ex. 2 at 4. McGinnis's report further indicates
that he questioned Lowrey "more intensely" because of Lowrey's
"reported computer knowledge." Pl.'s Ex. 2 at 5. Thus, while it
is not completely clear which three R&L employees Finley identified
for McGinnis as people with an interest in computers, the evidence
strongly suggests that the names of Lowrey, Spangler, and Mitchell
were given to McGinnis. Further, Bennett testified that he did not
have any "special interest in computers." Trial Tr. at 240:21-23.

related only to the 13 missing laptops from the March 3 shipment. Trial Tr. at 388:2-5.

As with Spangler, McGinnis also suspected that Mitchell was involved in the theft of the 13 laptop computers when Mitchell was first interviewed. Trial Tr. at 169:14-17. McGinnis explained that Mitchell "could not explain" the inconsistencies in the shipping manifest entries, and McGinnis "felt that Mitchell was being deceptive in his answers." Pl.'s Ex. 2 at 5. Mitchell's mannerisms also led McGinnis to believe that he was "not being truthful." Pl.'s Ex. 2 at 5-6.

Lowrey was another of the nine employees McGinnis interviewed as part of his investigation. McGinnis's first interview with Lowrey lasted about 10 minutes, and Lowrey said that he did not know anything about the missing computers. Trial Tr. at 379:14-16, 379:21-22. McGinnis then interviewed Bennett for 10 or 15 minutes, and Bennett also said that he did not know anything about the theft. Trial Tr. at 168:9-13, 380:9-18. Bennett offered "direct answers to questions asked," but McGinnis "felt that Bennett also knew more than he would admit . . . ." Pl.'s Ex. 2 at 5. McGinnis believed that Lowrey's and Bennett's mannerisms were suggestive that they, too, were "not being truthful." Pl.'s Ex. 2 at 5-6. This would be the only time that McGinnis would interview Bennett. Trial Tr. at 168:9-13.

On Wednesday evening, March, 29, 2006, Spangler's wife ("Mrs. Spangler") called McGinnis, Trial Tr. at 389:12-14, and told him

7

that her husband had come home from work and was worried that he might get in trouble for stealing three Hewlett Packard computers.[4] Trial Tr. at 389:20-23. Spangler reportedly told his wife that he did not steal the three computers, but that he knew who did steal them. Trial Tr. at 398:22. Therefore, McGinnis told Mrs. Spangler to have Spangler call McGinnis. Trial Tr. at 394:14-15. Spangler then called McGinnis, who instructed Spangler to meet him at a Pilot truck stop down the road from the Richmond Terminal, which Spangler did. Trial Tr. at 393:15 - 394:6. For approximately the next 30 minutes, McGinnis conducted a third interview with Spangler. Trial Tr. at 396:21-22.

According to McGinnis's trial testimony, Spangler told McGinnis in this third interview that, on Friday, March 17, 2006, Spangler and Mitchell were together in the parking lot of the Richmond Terminal and "observed Clyde Bennett take three Hewlett Packard tower computers out the front door . . . while David Lowery . . . was down at the guard building distracting the guard." Trial Tr. at 394:25 - 396:3. That version of Spangler's story, however, is *not* in McGinnis's report. Trial Tr. at 425:5-7. McGinnis also testified at trial that Spangler said that he "[s]aw both Mr.

---

[4] It is worth noting that, according to McGinnis's testimony, McGinnis had not yet questioned Spangler about the three missing HP computers before Mrs. Spangler's unsolicited phone call, as McGinnis focused his interview with Spangler exclusively on the thirteen missing laptops. The record does not reflect what, if any significance, McGinnis attributed to this rather suspicious circumstance.

8

Bennett and Mr. Lowrey down at the OS&D section around the six computers." Trial Tr. at 396:11-12. That aspect of Spangler's story *was* contained in McGinnis's report. Trial Tr. at 424:23-24; Pl.'s Ex. 2 at 6.

Records and testimony reflect, however, that Spangler did not even report for work at R&L on March 17, the night on which he allegedly observed Bennett milling around the OS&D section and/or taking three computers out of the front door. Trial Tr. at 147:8 - 148:5, 258:3-11. McGinnis would not, however, ascertain during the course of his investigation whether Spangler had actually been at work on March 17. Trial Tr. at 432:1-4. Before concluding his March 29 meeting with Spangler, though, McGinnis did ask Spangler to prepare a written statement for him related to Spangler's alleged observations. Trial Tr. at 162:16-19.

Following the third interview with Spangler, McGinnis returned to the Richmond Terminal and decided to question Lowrey again. Pl.'s Ex. 2 at 7. McGinnis's second interview with Lowrey took place at 9:00 p.m. that Wednesday evening, March 29, and lasted about 45 minutes. Trial Tr. at 400:1-14, 401:3-8. Finley and Bullard sat in on the interview, but McGinnis did all of the questioning. Trial Tr. at 401:17-18. McGinnis first "confronted [Lowrey] with the information [McGinnis] had" by "giving [Lowrey] information about what others had told [McGinnis] that Bennett had done." Trial Tr. at 406:2-7. In other words, McGinnis was

9

"[t]elling [Lowrey] what [McGinnis] heard" from Spangler. Trial Tr. at 406:4-6. After Lowrey initially denied the veracity of Spangler's version of the facts, "the conversation got a little heated," and Lowrey "finally broke down" and agreed with Spangler's story, saying that was "the way it happened." Trial Tr. at 406:15-17, 402:4-5.

According to McGinnis, Lowrey also added the following to Spangler's story: Lowrey told McGinnis that Bennett had told Lowrey shortly before it was time for their shift to end on March 17, 2006 that he needed "to get something." Trial Tr. at 402:12-13; Pl.'s Ex. 2 at 7. Lowrey said that he did not know to what Bennett was referring, so Lowrey exited the terminal and began talking to the guard at the guard shack. Trial Tr. at 402:7-9; Pl.'s Ex. 2 at 7. Then, when Bennett later walked by the guard shack, Lowrey said he asked Bennett if he got what he needed, and Bennett replied that he had. Trial Tr. at 402:13-18; Pl.'s Ex. 2 at 7. The following morning, according to Lowrey, Bennett called Lowrey about purchasing an HP tower computer for $250. Trial Tr. at 402:19-22. Lowrey said that he met Bennett at a 7-11 store and purchased the computer for $250. Trial Tr. at 420:20-22; Pl.'s Ex. 2 at 7. Lowrey told McGinnis that he did not know the computer was stolen. Pl.'s Ex. 2 at 7. That, of course, flatly contradicts what Spangler told McGinnis (i.e., that Lowrey was distracting the guard while Bennett stole the computers), a story which Lowrey

10

adopted by saying that was the way it happened after McGinnis fed Spangler's story to Lowrey. Lowrey also said that he did not know where the other two missing HP computers were. Pl.'s Ex. 2 at 7. McGinnis believed that Lowrey was lying about that too and that he knew both that the computer was stolen and where the two other missing computers were. Pl.'s Ex. 2 at 7. Though not mentioned in his report, McGinnis testified at trial that he also asked Lowrey "why he paid $250 for a computer that had been stolen by Clyde Bennett," and Lowrey told McGinnis that "the computer was worth a thousand dollars . . . [and] was well worth the $250." Trial Tr. at 402:22-25.

Lowrey then told McGinnis that the computer he had allegedly purchased from Bennett was still in the box at Lowrey's house. Trial Tr. at 403:1-4. McGinnis asked Bullard to accompany Lowrey and him to Lowrey's house to recover the computer, and Bullard agreed. Trial Tr. at 403:8-11. Before leaving the Richmond Terminal, McGinnis told Finley that "[he] would like for [him] to call the police and have them [t]here when [he] c[a]me back" because McGinnis "was going to press charges against Mr. Lowrey for theft."[5] Trial Tr. at 403:12-19.

---

[5] McGinnis's report simply states that, before leaving to go to Lowrey's house, he had instructed Finley to contact the police "and advise them of the theft and request their presence on our return when I would press formal charges." Pl.'s Ex. 2 at 7. Thus, in the report, McGinnis's pre-departure expressed intent to press charges, as relayed to Finley for further relaying to the police, was not explicitly limited exclusively to Lowrey, nor was it explicitly inclusive of an intent to press charges against both

11

Lowrey, McGinnis, and Bullard then went to Lowrey's house, but Lowrey refused to let McGinnis or Bullard accompany him inside the home. Trial Tr. at 403:24 – 404:1; Pl.'s Ex. 2 at 7. Lowrey went into his house by himself and returned with an HP tower computer in a box. Trial Tr. at 404:3-5, 404:9-10; Pl.'s Ex. 2 at 7. The trio then returned to the Richmond Terminal with the computer. By then, Chesterfield County Police patrol officer Jeffrey M. Deveney ("Officer Deveney") had already arrived at the terminal in response to Finley's call. Trial Tr. at 404:15-17, 343:16-17; Pl.'s Ex. 2 at 8. McGinnis explained to Officer Deveney "what had transpired and notified [Officer Deveney] that [R&L] wanted to press formal charges against both Lowrey AND Bennett." Pl.'s Ex. 2 at 8 (emphasis in original). In the meantime, Finley was able to confirm, by checking the serial numbers, that the computer recovered from Lowrey's home was in fact one of the three HP towers stolen from the OS&D area. Trial Tr. at 172:6-12.

Officer Deveney, another officer, Finley, Bullard, McGinnis, and Lowrey then went into Finley's office wherein Officer Deveney conducted an audio-taped interview with Lowrey for approximately 54

Lowrey *and* Bennett. At trial, Bullard testified that, before the police arrived, "McGinnis made the decision to have Bennett arrested." Trial Tr. at 130:18-25. Thus, Bullard knew that McGinnis planned to have Bennett arrested before the police were ever on the scene. Indeed, the Defendants admit that "McGinnis had made the decision to press charges against both Lowrey and Bennett at the time that he asked Finley to call the police." Defs.' Reply at 5 n.4. However, the record is devoid of any indication that either Finley or Bullard actually told the police that R&L wanted to press charges against Bennett.

minutes. Trial Tr. at 59:14-15, 131:13-20, 143:16-21, 407:12-17. Lowrey relayed to Officer Deveney the same story that he had told McGinnis earlier that evening indicating that Bennett had stolen the computers and sold him one for $250. Trial Tr. at 347:14-17; Pl.'s Ex. 10. Although McGinnis was present for this interview, it appears that McGinnis did not tell Officer Deveney that he previously had concluded that both Lowrey and Spangler had lied to McGinnis. The police officers determined that Lowrey could be charged with "Theft by Receiving Stolen Property," and asked Lowrey if he would consent to the search of his home without a warrant, which he did. Pl.'s Ex. 2 at 8. Lowrey and a Chesterfield County Property Detective then went back to Lowrey's home, and the home was searched. Pl.'s Ex. 2 at 8.

Officer Deveney then conducted an audio-taped interview with Bennett for approximately 12 minutes. Trial Tr. at 59:14-15, 347:19-22. McGinnis, Finley, and Bullard[6] were present at the interview. Trial Tr. at 408:12-21. Bennett continued to deny having had any involvement in the disappearance of the computers. Pl.'s Ex. 9; Pl.'s Ex. 2 at 8. After the interview, Officer

---

[6] Bullard testified that he was *not* present during Officer Deveney's interview of Bennett. Trial Tr. at 131:13-20. Officer Deveney testified that Bullard *was* present during Bennett's interview. Trial Tr. at 347:25 - 348:3. McGinnis testified that Bullard was "in and out" of Officer Deveney's interview with Bennett because "[h]e had other pressing business with some of the other terminals." Trial Tr. at 408:17-21. Thus, the jury reasonably could have found that Bullard was present for at least part of Bennett's interview with Officer Deveney.

13

Deveney called his supervisor and spoke with the Property Detective at the Richmond Terminal. Trial Tr. at 350:10-17. Then, according to Officer Deveney, he and the Property Detective "made the decision to arrest Mr. Bennett," testifying that no R&L employees "ma[d]e any effort to influence anything [he] did in [his] investigation." Trial Tr. at 349:8-12, 350:24-25. Officer Deveney then placed Bennett in handcuffs, took him out of the building, walked him by his co-workers who were eating lunch, placed him in Officer Deveney's patrol vehicle, and transported him to the magistrate's office. Pl.'s Ex. 2 at 8; Trial Tr. at 264:5-10, 351:2-7. On his way out of the terminal, Bennett was stopped by Finley who said, "Clyde, you no longer have a job with R&L." Trial Tr. at 263:24 – 264:3. R&L did, in fact, terminate Bennett. Trial Tr. at 145:4-6.

Once Officer Deveney and Bennett were with the magistrate, Officer Deveney "summarized the interviews that [he] had with Mr. Lowrey and Mr. Bennett and presented that information to the magistrate." Trial Tr. at 353:11-14. Officer Deveney was the only person who spoke with the magistrate. Trial Tr. at 351:17-19. He did not play either of his audio-taped interviews with Lowrey or Bennett. Trial Tr. at 355:3-6. The magistrate, of course, was not told that McGinnis had decided that Lowrey was a liar or that Lowrey had implicated Bennett only after McGinnis had fed to Lowrey a story told by Spangler whom McGinnis also thought to be a liar.

14

The magistrate then issued a felony embezzlement warrant. Trial Tr. at 353:16-19. Officer Deveney served the warrant on Bennett and turned him over to the Sherriff's department for processing. Trial Tr. at 353:22-24. Bennett was then processed by the Sheriff's department and released on personal recognizance bond. Trial Tr. 265:14 - 266:2.

The following morning, Thursday, March 30, 2006, Mitchell called McGinnis, and McGinnis advised Mitchell to meet him at the Pilot truck stop down from the Richmond Terminal, which Mitchell did. Pl.'s Ex. 2 at 9. During this conversation, Mitchell reversed his previous statements and reportedly told McGinnis "verbatim" the "[e]xact same story that Spangler" previously had told to McGinnis. Trial Tr. at 397:4-6. Mitchell explained that "Spangler convinced [him] to come to talk to [McGinnis]." Trial Tr. at 397:20-21. This was the first time McGinnis had spoken to Mitchell since his initial interview with him on Monday, March 27. Thus, Mitchell had never "admitted" anything to McGinnis or given any statement incriminating Bennett until after Bennett was arrested. Trial Tr. at 424:8-11. Moreover, when Mitchell spoke, he acknowledged that he had first spoken to Spangler whose story Mitchell adopted.

Also, after Bennett was arrested, but before McGinnis left Richmond on Friday morning March 31, McGinnis received the written statement that he had requested of Spangler. Trial Tr. at 411:16-

20, 162:16-25. The handwritten statement reads as follows: "Dave Lowery has told me that he goes to the guard shack and distracts the guard while Clyde takes stuff out the front door & to the vehicles." Pl.'s Ex. 3 at 1. This statement, wherein Spangler indicates that *Lowrey told Spangler* that Lowrey and Bennett stole the computers, directly conflicts with what Spangler told McGinnis in his third interview at the Pilot station – that *Spangler had actually seen* Lowrey and Bennett steal the computers. It is undisputed that McGinnis never gave Spangler's handwritten report to the police, the magistrate, the state prosecutor or the state court nor that he never directed to their attention the disparity in Spangler's statements. Trial Tr. at 173:19-22.

Months later, on November 6, 2006, Bennett reported for his preliminary hearing for a determination of probable cause. Trial Tr. at 285:24 - 286:1. McGinnis, Finley, and Lowrey also were present under subpoena and all three testified. Trial Tr. at 266:7-8. The audio tapes of the interviews with Lowrey and Bennett were not played. Trial Tr. 266:9-14. Spangler's handwritten statement was not presented. Trial Tr. 266:15-17. Nor was the state judge ever told that McGinnis had declared Lowrey to be a liar or that Lowrey's testimony simply was the adoption of a story Spangler (whom McGinnis also had declared to be a liar) had told to McGinnis which McGinnis fed to Lowrey. Melissa Hoy ("Hoy"), Assistant Commonwealth's Attorney in Chesterfield County, was the

sole prosecutor assigned to the embezzlement case against Bennett and also was present at the hearing. Trial Tr. at 358:24 - 359:4, 359:14-24. After the probable cause hearing, the case was certified to the Chesterfield County grand jury and set for trial in circuit court. Trial Tr. at 360:2-6.

The case against Bennett, however, was never tried. Hoy ultimately *nolle prossed* the case because Lowrey, the testifying co-defendant, did not appear for his own trial which was set for the same day as Bennett's trial. Trial Tr. at 360:15-20. When Lowrey, "a material witness" in Bennett's case, failed to appear, Hoy "had to nolle pros[s]e the case and then issue a [capias for Lowrey's arrest] for his failure to appear." Trial Tr. at 360:20 - 361:6. Bennett has never been recharged with a crime related to the missing R&L computers. Bennett paid his criminal defense attorney, Frank Hall ("Hall"), $7,019 in legal fees.[7]

As of the date of the trial of this action, Bennett had been unable to secure full-time employment notwithstanding that he had contacted approximately 100 employers in and around Richmond,

---

[7] Bennett testified that his criminal defense cost him "about $6,600." Trial Tr. at 626:5 - 627:2. Bennett's counsel expressed in his opening statement on damages that Bennett incurred "about $7,500" in criminal defense legal fees. Trial Tr. at 612:6-7. Plaintiff's Exhibit 21, introduced at trial, indicates that Bennett's defense fees totaled $7,019.18, representing the $4,719.18 that Bennett has already paid Hall for his criminal defense, as well as the $2,300.00 that Bennett still owes Hall. Pl.'s Ex. 21 at 1-6. In their post-trial briefs, the parties all refer to a figure of "$7,019" for the criminal defense fees, and, for the sake of brevity and clarity, the Court will do the same herein.

17

Virginia. Trial Tr. at 622:8 - 623:15, 634:11-14; Pl.'s Ex. 16 at 1-16. Bennett also attempted to start his own business while continuing to contact possible employers in and out of the freight industry, but that attempt failed. Trial Tr. at 623:16 - 624:15. In April 2009, Bennett obtained part-time work with his brother's business earning about $8 per hour, twenty hours per week. Trial Tr. at 625:11-25, 640:19-21. The Social Security Administration calculates Bennett's normal full retirement age at "66 years and two months."[8] Trial Tr. 631:1-8.

As a direct consequence of the inability to obtain full-time employment, Bennett exhausted completely the $81,222.48 money market account and the $28,000 annuity. Trial Tr. at 618:15-24. The loss of those savings "tore [Bennett] apart" because he "had worked hard all [his] life to save this money." Trial Tr. 619:9-13. Bennett no longer has medical benefits, so he does not see physicians for medical conditions because he cannot afford to pay for medical services. Trial Tr. at 620:7-18. He thinks about his arrest "daily" and feels "betrayed." Trial Tr. at 619:14-19. He worries "all the time" about what will happen if he gets sick and

---

[8]Bennett refers to this age figure as sixty-seven years in his brief, Pl.'s Mem. Opp'n at 21, but referred to it as sixty-six years in closing argument, Trial Tr. at 667:2. The Defendants refer to this age figure as sixty-six years in their motion, Defs.' Mem. Supp. at 31, and fail to address the issue at all in their reply brief. With an eye to accuracy, the Court will not make loose presumptions and approximations and will, instead, use the precise age of "sixty-six years and two months" when referring to Bennett's Social Security retirement age to comport with the specific evidence adduced at trial.

18

whether he will have food and shelter. Trial Tr. at 633:18-25. Bennett, however, is "not aware of anyone who will say [his] reputation has been damaged." Trial Tr. 639:4-8.

Bennett's family, a few friends, his girlfriend, his co-workers, and all of the approximately 100 prospective employers knew about Bennett's arrest. Trial Tr. at 632:17-21. As a result of his changed financial position, Bennett suffered the embarrassment of having to move out of the apartment he shared with his girlfriend and her daughter and into his father's home. Trial Tr. at 632:25 - 633:8. Until this time, he had not lived at home since approximately age twenty. Trial Tr. at 633:10-15. Before his arrest, Bennett had never had to search for a job for "more than a few months at most." Trial Tr. at 636:6-8.

Bennett's brother, Billy J. Bennett, Jr. ("Billy"), testified that Bennett was "very happy," "easy going," and "fun to be around" prior to his arrest and prosecution. Trial Tr. at 615:3-7. After the arrest and prosecution, however, Billy described his brother as being "secluded," "isolated . . . from his family," "quiet," and "pretty devastat[ed]." Trial Tr. at 615:8-13. Bennett's other brother, Michael Wade Bennett ("Michael"), agreed that Bennett had always been a "happy, jovial person" who "liked to talk to people" and "[e]njoyed conversation" before his arrest and prosecution. Trial Tr. at 616:17-22. Michael testified that, after the arrest

19

and prosecution, Bennett has been "very subdued" and "very withdrawn." Trial Tr. at 616:23 - 617:2.

## II.  Procedural Background

Bennett filed a malicious prosecution action on June 11, 2008 in Chesterfield Circuit Court, naming as defendants (1) R&L Carriers, Inc., (2) Finley, (3) Bullard, (4) Lowrey, and (5) McGinnis.  The action was timely removed based on diversity jurisdiction.  The claims against Lowrey were abated and dismissed on February 27, 2009 for failure to serve.  Subsequently, Bennett filed a first, and then a second, Amended Complaint in which he substituted R&L and Greenwood Motor Lines, Inc. ("Greenwood") for R&L Carriers, Inc.  In his Second Amended Complaint, Bennett also added a racial discrimination claim under 42 U.S.C. § 1981 ("Count II") to go along with the state malicious prosecution claim ("Count I").  Before commencing the trial, the Court granted Bennett's motion to dismiss Greenwood with prejudice, thus leaving only R&L, Finley, Bullard, and McGinnis as defendants.

The Defendants filed a motion for summary judgment which was denied, and, thereafter, the Court granted the parties' joint oral motion to bifurcate the trial.  The liability phase of the trial began on November 30, 2009.  At the close of the Plaintiff's case on December 1, 2009, the Defendants moved for judgment as a matter of law pursuant to Rule 50(a) as to both Counts I and II.  The motion was denied as to Count I and granted as to Count II.  At the

20

close of the liability phase of the trial, the jury returned a verdict in favor of Bennett against all of the Defendants. Following the damages phase of the trial, the jury awarded Bennett $1,716,920 in compensatory damages, and punitive damages in the sum of $1,500,000 against R&L, $3,000 against Finley, $15,000 against Bullard, and $30,000 against McGinnis.

On December 30, 2009, the Defendants renewed their motion for judgment as a matter of law pursuant to Rule 50(b), and moved, in the alternative, for a new trial and remittitur pursuant to Rule 59.[9]  The parties submitted memoranda in support of their respective positions, and presented oral argument.  Accordingly, this matter is ripe for decision.

## LEGAL STANDARDS

Pursuant to Rule 50, a party who has moved for judgment as a matter of law at trial may, within twenty-eight days of the entry of judgment, renew the request for judgment as a matter of law, which may include an alternative request for a new trial.  Fed. R. Civ. P. 50(b).  In ruling on a renewed motion for judgment as a matter of law, a court has several options and may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law on the claims.  Fed. R. Civ. P. 50(b)(1)-(3).  It is well-established that a "Rule 50(b) motion

---

[9]The Defendants orally made their motion at the end of the trial on December 2, 2009.  The Defendants were then granted an extension of time to file their motion in written form, which motion was filed on December 30, 2009.

should be granted if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999) (citing White v. Cnty. of Newberry, 985 F.2d 168, 172 (4th Cir. 1993)). In other words, a district court may grant judgment as a matter of law "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party . . . ." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (quoting Abasiekong v. City of Shelby, 744 F.2d 1055, 1059 (4th Cir. 1984)). More specifically, a renewed motion for judgment as a matter of law is properly granted "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Wheatley v. Wicomico Cnty., Md., 390 F.3d 328, 332 (4th Cir. 2004) (citing Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995)).

Unlike a motion made under Rule 50, a motion made under Rule 59(a) permits the Court to weigh the evidence and to consider the credibility of witnesses. Cline, supra, 144 F.3d at 301 (citing Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir. 1989)). A new trial is to be granted under Rule 59(a) if: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would

prevent the direction of a verdict." Id. (quoting Atlas Food Sys.

& Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th

Cir. 1996)). The decision to grant or deny a new trial is within

the sound discretion of the district court. Id.

**DISCUSSION**

**I.    The Defendants' Rule 50 Motion for Judgment as a Matter of Law**

The Defendants advance five arguments in support of their Rule

50(b) motion. The first four arguments relate to the elements of

Bennett's malicious prosecution claim, and the fifth argument

relates to the punitive damages award. Each argument will be

addressed in turn.

**A.    Elements of the Malicious Prosecution Claim**

In Virginia, a plaintiff in a malicious prosecution case must

prove "by a preponderance of the evidence that the prosecution was:

(1) malicious; (2) instituted by, or with the cooperation of, the

defendant; (3) without probable cause; and (4) terminated in a

manner not unfavorable to the plaintiff." Hudson v. Lanier, 497

S.E.2d 471, 473 (Va. 1998). While "[a]ctions for malicious

prosecution are not generally favored in law, . . . when the

requirements have been met and the proper elements to support the

action have been presented, the action will be readily upheld."

Wiggs v. Farmer, 135 S.E.2d 829, 831 (Va. 1964). In their Rule

50(b) motion, the Defendants attack all four elements of a

malicious prosecution claim as having been unproven at trial.

### (1) **Instituted by, or with the Cooperation of, the Defendants**

The Defendants contend that Bennett failed to establish that his prosecution was "instituted by, or with the cooperation of," defendants Finley or Bullard. The Defendants do not argue that this element was not satisfied as to McGinnis, and consequently, R&L. The Court will treat this element, therefore, as conceded by the Defendants as to McGinnis and R&L.[10] The jury was instructed on this element that: "A person institutes criminal proceedings against another by: (1) bringing the criminal charge; or (2) cooperating actively in bringing the criminal charge." J.I. No. 20. The parties and the Court agree that, on the record made at trial, "the institution of the criminal proceedings was the arrest process[.]" Trial Tr. at 460:18-21. Thus, the relevant inquiry is whether Bennett's *arrest* was "instituted by, or with the cooperation of," Finley and/or Bullard.

Neither party suggests that a single, specific rule exists in Virginia for how a court determines whether a criminal proceeding was "instituted by, or with the cooperation of," a defendant. Indeed, a review of Virginia malicious prosecution decisional law indicates that there is no one articulated rule. Bennett did not

---

[10] Even if the Defendants had not conceded this element as to McGinnis and R&L, there is no doubt that Bennett's prosecution was "instituted by, or with the cooperation of," McGinnis, and thus R&L as principal, and the Court would so find, given McGinnis's explicit statements of intention to press charges against Bennett before any police involvement in the process.

offer any authority on the issue, and the Defendants offer two cases as authority: (1) King v. Martin, 142 S.E. 358 (Va. 1928) and (2) Brice v. Nkaru, 220 F.3d 233 (4th Cir. 2000).

In King, the Supreme Court of Virginia reversed the trial court's decision not to set aside a jury verdict returned in favor of a malicious prosecution plaintiff where the defendant, "as a matter of law, was not responsible for the [plaintiff's] prosecution," explaining that: the defendant "left the matter entirely in the hands of the police department." King, supra, 142 S.E. at 359-60. He "did not request that [the plaintiff] be arrested or held." Id. In fact, "[n]ot one single active or voluntary step was taken by him at any stage of the proceedings." Id. at 360. Finding that "as a matter of law, [the evidence] fail[ed] to show that the defendant instigated or caused or had anything to do with the prosecution except to appear as a witness when summoned," the Court entered judgment for the defendant. Id. at 361.

Similarly, in Brice, the Fourth Circuit reversed the district court's denial of a malicious prosecution defendant's motion for judgment as a matter of law following a jury verdict in favor of the plaintiff because, "as a matter of law," the defendant "did not institute or procure the prosecution of [the plaintiff]." Brice, supra, 220 F.3d at 241. The Fourth Circuit explained that "[t]he police independently investigated the case [and] identified [the

25

plaintiff] as a suspect . . . ." <u>Id.</u> at 238. Further, "[t]he police - not [the defendant] - sought and obtained the warrant that ultimately led to [the plaintiff's] prosecution." <u>Id.</u> With respect to the defendant's having reported the occurrence of the crime to the police and responded to police requests to verify a suspect's identity, the Fourth Circuit explained that "the critical question is whether the witness provided the police with his honest or good faith belief of the facts." <u>Id.</u>

In <u>Brice</u>, the Fourth Circuit also cited a number of other authorities analyzing the issue of the "instituted by, or with the cooperation of," element of a malicious prosecution claim. The Court of Appeals noted <u>American Law Reports</u>' explanation that "normally a malicious prosecution plaintiff must show that defendant did more than merely give information that included an identification, <u>e.g.</u>, that he requested the initiation of proceedings, signed a complaint, or swore out an arrest warrant against plaintiff." <u>Id.</u> at 239 (citing 66 A.L.R.3d Summary 10 § 3 (1975)). Additionally, the Court of Appeals noted the Ninth Circuit's explanation that a private party does not proximately cause injuries from an arrest "absent some showing that [the] private party 'had some control' over [the] state officials' decision." <u>Id.</u> (quoting <u>King v. Massarweh</u>, 782 F.2d 825, 828-29 (9th Cir. 1986)).

Two other decisions from the Supreme Court of Virginia also help to define the "instituted by, or with the cooperation of" element of a malicious prosecution case. In Am. Ry. Express Co. v. Stephens, 138 S.E. 496 (Va. 1927), the Court held that the trial court erred in not setting aside the jury's verdict for the plaintiff and entering judgment for the defendant because "[t]he prosecution was not instituted by [the defendant]." Am. Ry. Express Co., supra, 138 S.E. at 501. The Court explained that "there [wa]sn't a line of testimony in the whole voluminous record that indicate[d] that any of the [defendant's] officials ever urged or even suggested to the Commonwealth's attorney that he prosecute the plaintiff." Id. at 500. The record indicated that "the Commonwealth's attorney personally conducted the investigation of the case from the very beginning." Id. at 501. Therefore, "as a matter of law the prosecution was instituted by the Commonwealth's attorney," not the defendant. Id. at 500.

In Clinchfield Coal Corp. v. Redd, 96 S.E. 836 (Va. 1918), the Court explained that:

> There can be no malicious prosecution without the machinery of the law, and it is therefore, of course, true that the officers of the law must be the final and effective actors. The question in every case is: Was the prosecution instigated or brought about by the cooperation of the defendant? Such instigation or co-operation may be chargeable to the defendant from original steps taken by him to incite the prosecution, or from subsequent adoption and ratification by him of steps

27

> which have already been taken or instigated by
> others.

Clinchfield Coal, supra, 96 S.E. at 839 (internal citations omitted).

Thus, reconciling the relevant case law, to find that the "instituted by, or with the cooperation of" element has been satisfied, the Court must ascertain whether a defendant affirmatively, actively, and voluntarily took steps to instigate or to participate in the arrest of the defendant, and whether the defendant exercised some level of control over the decision to have the plaintiff arrested. A defendant instigates or cooperates in the proceedings by either taking the original steps to initiate the proceeding (here the arrest) or by subsequently adopting and ratifying the steps that others have already taken to initiate proceedings.

On the other hand, where a defendant's involvement in a prosecution is to appear as a witness when summoned, he may not be held civilly liable for "instituting" or "cooperating" in the prosecution of the suspected criminal. Similarly, if a defendant simply reported the occurrence of events to the police, gave information to the police, and responded to police requests to verify a suspect's identity, then that individual cannot be held liable for malicious prosecution so long as the information provided was with an honest or good faith belief of the facts reported. Additionally, if the police or the Commonwealth's

28

attorney conducted the investigation of the case from the very beginning, a private individual cannot be liable. These generally applicable principles guide assessment of the motions made by Finley and Bullard.

### (a) Finley

Finley was the manager of the Richmond Terminal at all relevant times. After three computers mysteriously went missing from the Richmond Terminal within two weeks of the unexplained disappearance of thirteen other computers, Finley relayed the problem to his superior, Bullard. He later met with McGinnis, at McGinnis's request, to discuss which R&L employees might have a special interest in computers. He was present at the McGinnis (R&L) and police interviews of Lowrey and Bennett, though he did not speak. When Bullard and McGinnis left the Richmond Terminal to retrieve the computer from Lowrey's house, Finley, at McGinnis's direction, called the police and asked them to come to the terminal. Finley met with Bullard and McGinnis about the identification numbers of possible stolen computers and confirmed that the computer recovered from Lowrey's house was one of the computers missing from the March 17 shipment. Months later, Finley testified under subpoena at Bennett's probable cause hearing.

As a matter of law, Finley's actions do not constitute the affirmative, active, and voluntary involvement required to satisfy the "instituted by, or with the cooperation of" element of a

malicious prosecution claim. Though Finley was present at the two interviews with Bennett and Lowrey, he did not actively participate in them in any way. Finley had little, if any, control over the investigation or the ultimate decision to have Bennett arrested. He answered questions about possible suspects with an interest in computers because McGinnis posed the questions to him. He placed the phone call to the police because McGinnis directed him to do so. More importantly, the record does not indicate: (1) that Finley actually requested Bennett's arrest on the initiation of the criminal proceedings in his phone call to the police; or (2) that he even knew that McGinnis would ultimately make a request for Bennett's arrest.[11] Nothing was presented at trial that indicates that Finley did anything other than simply place the call to put the investigation entirely in the hands of the police department. Virginia law does not place an affirmative burden on an inferior employee to challenge the decisions and actions of his superior to avoid malicious prosecution liability. Nor does his conduct constitute adoption or ratification of McGinnis's decision to have Bennett arrested.

Accordingly, without weighing the evidence or considering the credibility of the witnesses, it is clear that there is no legally sufficient evidentiary basis for a reasonable jury to have found in favor of Bennett against Finley because Bennett failed to make a

---

[11] Before Finley called the police, he knew that McGinnis intended to press charges against *Lowrey*. Trial Tr. at 403:12-19.

showing on an essential element of that claim against Finley.
Therefore, the Court will grant the Defendants' Rule 50(b) motion
in part and will direct the entry of judgment as a matter of law in
favor of Finley on that claim.

### (b) Bullard

Whether Bullard's actions constitute the affirmative, active,
and voluntary involvement required for malicious prosecution
liability is made on a record reflecting his somewhat different
involvement. At all relevant times, Bullard was R&L's Director of
Operations for the Southeastern United States. Bullard was present
at the Richmond Terminal in March 2006 for reasons unrelated to the
computer theft investigation. After Finley reported the missing
computers to Bullard, and R&L was unable to identify them as having
been cross-shipped or otherwise misplaced, Bullard voluntarily
placed the call to McGinnis to begin the theft investigation.
Bullard was likely present at both the R&L and police interviews
with Bennett and Lowrey, but he did not actively participate in
either interview. Bullard also later accompanied McGinnis, at
McGinnis's request, to Lowrey's home to recover one of the stolen
computers. Bullard believed that he had the authority to end the
investigation and thus prevent Bennett's arrest; however, McGinnis
did not believe that Bullard had such authority.

While the record does not indicate that Bullard actually
requested that the police initiate criminal proceedings, Bullard

31

admitted to knowing that McGinnis, before Officer Deveney's interview with Bennett, intended to make such a request. Whether or not Bullard actually could have ended the investigation prior to Bennett's arrest, he *believed* that he had that authority. Thus, believing that he had that authority, and knowing that McGinnis planned to press charges before the police were ever involved, Bullard allowed the police to arrive at the Richmond Terminal and arrest Bennett. Therefore, it appears that Bennett's theory is, and the evidence suggests, that Bullard, an employee with more authority and higher corporate standing than Finley, tacitly adopted and ratified the steps taken by McGinnis.

However, even so, Bullard cannot be liable as a matter of law. The relevant Virginia decisional law explains that liability for adoption and ratification requires that a malicious prosecution defendant possess both: (1) full knowledge of the background steps taken by others; and (2) subsequent individual, active participation in continuing the prosecution or seeking the arrest or conviction of the plaintiff. See Va. Elec. & Power Co. v. Wynne, 141 S.E. 829, 834 (Va. 1928); see also Clinchfield Coal, supra, 96 S.E. at 841; Manuel v. Cassada, 59 S.E.2d 47, 52 (Va. 1950). While Bullard appears to have had full knowledge of the background steps and McGinnis's intention to press charges against Bennett, Bullard did not actively adopt McGinnis's previous actions by requesting Bennett's arrest himself or by actively voicing his

agreement with McGinnis's decision to press charges. Virginia law does not require Bullard to actively voice disagreement with, or disapproval of, McGinnis's decision to avoid malicious prosecution liability. Only a malicious prosecution defendant's active and voluntary actions can expose him to liability, and Bullard, who was cumulatively involved in the investigation only two-and-one-half hours, simply was not actively or affirmatively involved in instituting Bennett's arrest.

Accordingly, without weighing the evidence or considering the credibility of the witnesses, it is clear that there is no legally sufficient evidentiary basis for a reasonable jury to have found in favor of Bennett against Bullard because Bennett failed to make a showing on an essential element of his case with respect to which he had the burden of proof - the element that Bennett's criminal proceedings were instituted by, or with the cooperation of, Bullard. Therefore, the Court will grant the Defendants' Rule 50(b) motion in part and will direct the entry of judgment as a matter of law in favor of Bullard on the malicious prosecution claim.

**(2) Probable Cause**

The Defendants[12] argue that Bennett failed to establish that the Defendants lacked probable cause at the time they instituted criminal proceedings against Bennett. In Virginia, in the context of a malicious prosecution action, probable cause is defined as "knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected."[13] Andrews v. Ring, 585 S.E.2d 780, 786 (Va. 2003). "The determination whether a defendant had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charges."[14] Stanley v. Webber, 531 S.E.2d 311, 314 (Va. 2000). Thus, the relevant inquiry is whether the Defendants had probable cause to believe that a crime was committed by Bennett at the time McGinnis

---

[12] Given the decision that, as a matter of law, neither Finley nor Bullard instituted, or cooperated in the institution of, Bennett's arrest, all henceforward references to "the Defendants" will refer only to McGinnis and R&L.

[13] The jury was instructed on this point of law as follows: "Probable cause to institute criminal proceedings against the plaintiff existed if the facts and circumstances known to the defendants and on which they acted were such that a reasonable and prudent man acting on the same facts and circumstances would have believed the plaintiff guilty." J.I. No. 25.

[14] The jury was instructed on this point of law as follows: "You shall consider the facts and circumstances as they appeared to the defendants at the time they instituted the criminal proceedings." J.I. No. 25.

told Officer Deveney that "[R&L] wanted to press formal charges against both Lowrey AND Bennett." Pl.'s Ex. 2 at 8 (emphasis in original).

### (a)  Probable Cause Based on Informant "Accomplice"

The Defendants argue that, as a matter of law, their probable cause determination was sound because it was based on the confession of an alleged accomplice of Bennett's - Lowrey. The Defendants correctly state that "information received from one admitting his participation in a crime is sufficient to create probable cause for prosecution, if there is no reason to doubt its truth." So. Ry. Co. v. Mosby, 70 S.E. 517, 521 (Va. 1911). Indeed, in Mosby, "there [wa]s no ground upon which it could be fairly concluded that [the investigator for the railroad whose shipments had been stolen] knew that the sources from which he got his information were not reliable before he instituted th[e] prosecution." Id. The Western District of Virginia, citing Mosby, echoed this proposition, explaining that, "[i]f there is no reason to doubt the truthfulness of the accomplice when the prosecution was initiated, there is still considered to be probable cause sufficient to negate a malicious prosecution claim even if the witness was later shown to be unworthy of belief." Caldwell v. Green, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006).

Bennett does not challenge that this is indeed the law in Virginia, but, instead, he emphasizes correctly that "Virginia

35

courts will find probable cause only if the informant is reliable and trustworthy," and he contends that the alleged informants – Lowrey, Spangler, and Mitchell - "do not pass the reliability requirement." Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Mem. Opp'n") at 14. The discussion of Spangler and Mitchell under Mosby, however, is misplaced because neither Spangler nor Mitchell implicated *themselves* as Bennett's accomplices. Instead, Spangler and Mitchell implicated only Bennett and Lowrey, and, therefore, Spangler and Mitchell did not "confess" to anything that would make a probable cause determination sound under the "informant accomplice" principle upon which the Defendants rely. Accordingly, statements from Spangler and Mitchell do not fall under the "informant accomplice" probable cause rule. Nevertheless, Bennett's discussion of the application of the principle as to Lowrey under Mosby is on point.

McGinnis noted no less than four times in his investigation report that, by the time prosecution was initiated, there was serious reason to doubt Lowrey's truthfulness. Specifically, McGinnis noted that "the mannerisms of . . . Lowrey . . . left [him] with a feeling that [he was] not being truthful." Pl.'s Ex. 2 at 5-6. McGinnis noted also that "Lowrey was lying . . . to take the heat off of him." Pl.'s Ex. 2 at 7. Additionally, when Lowrey told McGinnis that he did not know that the computer he allegedly purchased from Bennett was stolen, McGinnis noted that "this was

another lie." Pl.'s Ex. 2 at 7. Similarly, when Lowrey told McGinnis that he did not know where the other two computers were, McGinnis noted that this, too, was "another lie." Pl.'s Ex. 2 at 7. At trial, McGinnis tried to soften his previously recorded statements by saying that Lowrey was "deceptive in some of his answers." Trial Tr. at 160:6-8. But, McGinnis did not deny that, before he decided to press charges against both Lowrey and Bennett, he actually believed that Lowrey was an established liar and that the lies related to important matters coming from the person who was the key witness implicating Bennett in the theft. More troubling still, Lowrey did not implicate Bennett until McGinnis effectively fed Lowrey the information that he had received from Spangler - a man whom McGinnis also believed to be untruthful - and only then did Lowrey implicate Bennett. Therefore, Lowrey, the alleged informant accomplice, appears only to have "confessed" and "informed" on Bennett once McGinnis led him in that direction.[15]

---

[15] It is well-established that confessions and testimony created when the police provide the essence of the testimony lack reliability. Cf. United States v. Granbois, 119 F. App'x 35, 39 (9th Cir. 2004) (Certain "suggestive interviewing techniques" may be "so coercive as to render [witness] statements and testimony unreliable."); United States v. Noel, No. 1:06cr531, 2007 WL 777859, at *2 (E.D. Va. Mar. 9, 2007) ("[S]uggestive interview technique[s] a[re] material to the credibility of prosecution witnesses."); Love v. Freeman, 188 F.3d 502, No. 96-6361, table op. at 9 (4th Cir. Aug. 30, 1999) (warning of the dangers of using "suggestive interview techniques," "leading questions," and "coercive techniques" with children); Moore v. Illinois, 434 U.S. 220, 227 (1977)("[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures."); Miller v. Fenton, 474 U.S. 104, 109 (1985)

37

Moreover, even when Lowrey finally implicated Bennett by agreeing with a story given to McGinnis by Spangler, and then by McGinnis to Lowrey, McGinnis *still* did not believe that Lowrey was telling him the truth. Accordingly, McGinnis had every reason to, and did in fact, "doubt the truthfulness of the accomplice *when the prosecution was initiated*." Caldwell, supra, 451 F. Supp. 2d at 818 (emphasis added). Therefore, the information received from Lowrey, the "one admitting his participation in a crime," was unreliable and was not legally sufficient to create probable cause for prosecution. Indeed, under the circumstances, Lowrey's statement was so tainted and unreliable that it was of no real probative value even when considered with the other information known to McGinnis.

### (b) The Defendants' Knowledge at the Time of the Probable Cause Determination

Even without the aid of the "informant accomplice" rule, the Defendants assert that McGinnis had probable cause when he "asked Finley to call the authorities and/or at the time he said R&L would press charges." Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem. Supp.") at 17. The Defendants argue that the

---

("[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."); Washington v. Buraker, 322 F. Supp. 2d 692, 697 (W.D. Va. 2004) (Due process is violated where police officers procure a warrant and conviction by "continu[ing] to ask [a suspect] leading questions to feed him details of the [relevant] rape and murder until he confessed to the crime.").

38

following facts known to McGinnis at the time he decided to have
Bennett arrested gave him probable cause to initiate Bennett's
arrest:

> (1) Bennett, a supervisor, was responsible for
> theft prevention. (2) Lowrey and Bennett were
> the last to leave [so] Bennett had access to
> the stolen computers. (3) The OS&D was open
> [so] the three bulky boxes were likely in OS&D
> prior to the time that Lowrey and Bennett
> left. (4) [According to Spangler and Lowrey,]
> Lowrey was talking with the guard while
> Bennett took the computers out the front door
> . . . . (5) [According to Lowrey,] Lowrey had
> paid $250 to Bennett for one of the stolen
> computers and that it was at his house. (6)
> Spangler had also implicated Bennett.

Defs.' Mem. Supp. at 17.    These points, individually and
collectively, misapprehend in a material way the evidence adduced
at trial and the inferences which the jury was entitled to draw
from that evidence about what the Defendants knew at the time they
request the police to arrest Bennett.

    Thus, the evidence proved at trial that Bennett was first
implicated in the theft of the March 17, 2006 tower computers by
Spangler, a man whom McGinnis believed to be deceptive and
untruthful from the very beginning.    Second, from the outset,
McGinnis strongly suspected that Spangler had been involved in the
theft of the March 3, 2006 shipment of 13 laptops.    Then, too,
Spangler only came forward to implicate Bennett in the March 17,
2006 theft after Spangler believed (as relayed to McGinnis by
Spangler's wife), from his two heated interviews with McGinnis,

that he, himself, would be going to jail for theft. The jury thus reasonably could have found that McGinnis was not entitled to, or, indeed, did not, rely on what Spangler, whom McGinnis believed to be a liar, told him in the third interview when he recited a story implicating Bennett.

McGinnis fed Spangler's story to Lowrey, a man McGinnis had also believed to be a liar from the very beginning, and Lowrey, after a heated conversation, agreed with the third Spangler story, simply by saying that it was "the way it happened." McGinnis, believing that Lowrey was continuing to lie and that he also knew where all three of the missing HP tower computers were, then accompanied Lowrey to Lowrey's home where Lowrey refused to allow McGinnis into his home and produced only one of the three missing tower computers. McGinnis returned to the Richmond Terminal from Lowrey's home and immediately asked to press charges against Lowrey *and* Bennett.

In simple terms, then, McGinnis knew the following when he made the decision to press charges against Bennett: a liar, likely involved in a recent company computer theft, who was admittedly concerned about his own penological interests, changed his story and told a company investigator that the liar's shift supervisor was involved in a second, more recent company computer theft. Later that night, the investigator deliberately fed a second liar the first liar's story, and this second liar, who was also

implicated in the story, ultimately adopted the story, but deflected all criminal blame onto the shift supervisor. The second liar then, after refusing to allow the investigator into his home, produced from his home one of three missing computers, but the investigator believed the second liar also knew where the other two missing computers were located and was continuing to lie on that point. Based on the first and second liars' stories, and a single ten minute interview with the shift supervisor wherein the supervisor protested his innocence, the investigator decided to have the shift supervisor arrested. A jury reasonably could have concluded from this record that there was a lack of probable cause to believe that Bennett committed the crime.

The Defendants argue that "[w]hat McGinnis did not know, even if from Bennett's perspective he should have known, is implicitly immaterial [to the probable cause inquiry]." Defs.' Mem. Supp. at 17. To that end, the Defendants, though unarticulated precisely as such, pose the following question to the Court: "Does determining whether the Defendants had probable cause to initiate the Plaintiff's arrest include any consideration of that which the Defendants did not know or do, but purportedly should have known or done?" Defs'. Mem. Supp. at 2-3. While the Supreme Court of Virginia has already answered this question in the negative,[16] the

_____

[16]See Giant of Va. v. Pigg, 152 S.E.2d 271, 275 (Va. 1967) (The "test" for probable cause is "whether the facts and circumstances *known, or made known*, to the [initiator of criminal proceedings] are sufficient to justify a prudent and reasonable man in the

inquiry is irrelevant to this case because a reasonable jury could have determined that McGinnis did not have probable cause to have Bennett arrested without consideration of facts that he arguably should have discovered. In any event, the Defendants' argument is misdirected because the four items of evidence to which it is directed are probative respecting the element of malice and the propriety of a punitive damage award.

However, as to the Defendants' argument, they are correct in stating that, at the time the arrest decision was made, they did not yet know that: (1) Lowrey was a convicted felon, (2) shortly after the arrest, Spangler would write a contradictory statement, (3) Spangler had not worked the night he claimed to have witnessed the theft, or (4) Bennett was financially comfortable. And, the Defendants are correct that such knowledge could not be considered by the jury in deciding the element of lack of probable cause. Indeed, the jury was properly instructed on this point by Jury Instruction 25. There is no reason to believe that the jury disregarded the instruction.

While this knowledge certainly would have further informed the determination that probable cause did not exist, the record about

---

belief that an accused is guilty of the crime charged.") (emphasis added); see also Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000) ("Although an officer may not disregard readily available exculpatory evidence of which he is aware, the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause.").

knowledge that McGinnis did possess at the time of the arrest decision, as detailed above, without weighing the evidence or considering the credibility of the witnesses, clearly provided a legally sufficient evidentiary basis for a reasonable jury to find for Bennett as to the probable cause element of his malicious prosecution claim. Thus, Bennett did not fail to make a showing on this essential element of his case.

> (c) **Officer Deveney's, the Grand Jury's, the Prosecutor's, and the Preliminary Hearing Judge's Alleged Findings of Probable Cause**

The Defendants argue that probable cause existed as a matter of law because Officer Deveney, the preliminary hearing judge, the grand jury, Bennett's defense counsel at the preliminary hearing,[17]

---

[17] The Defendants argue, in bolded and underlined font, that "**Bennett's counsel conceded and acquiesced in the finding of probable cause** . . . ." Defs.' Mem. Supp. at 18 (emphasis in original). The Defendants refer to statements made by Bennett's criminal defense counsel, Frank Hall, at Bennett's preliminary hearing. The excerpt of the transcript reproduced in the Defendant's Supporting Memorandum reads as follows:

THE COURT: All right, Mr. Hall, do you have any evidence, sir?
MR. HALL: Judge, I do not.
THE COURT: Do you have argument?
MR. HALL: It's probable cause, Judge.
THE COURT: Do you submit it then on the evidence that we have heard?
MR. HALL: I must admit that is it [sic], there's a tenuous connection if at all, but we will get a chance to talk about that.
THE COURT: I think there's probably [sic] cause . . . .

The argument that this exchange evidences a concession as to the existence of probable cause borders on reckless. The most logical interpretation of the exchange appears to be that Hall answered the judge's question that, yes, he did have argument, and that that argument related to the absence of probable cause. The transcript

and the prosecutor believed that there was probable cause to proceed with Bennett's prosecution. In support of their argument that the probable cause determinations of these officials constitute the existence of probable cause as a matter of law, the Defendants cite <u>Westreich v. McFarland</u>, 429 F.2d 947, 949 (4th Cir. 1970), <u>Brodie v. Huck</u>, 47 S.E.2d 310 (Va. 1948), and <u>In re Trammel</u>, 388 B.R. 182 (E.D. Va. 2008). None of those decisions aid their position. In <u>Westreich</u>, the Fourth Circuit stated unambiguously that "Virginia has not expressly held that an indictment furnishes prima facie evidence of probable cause."[18]   <u>Westreich</u>, <u>supra</u>, 429

---

even refers to Hall's belief that he would "get a chance to talk about" the "tenuous" existence of probable cause later on in the hearing. At the very least, the exchange is unclear. To the extent that Hall's belief as to probable cause is even relevant, in no way does the exchange evidence that Bennett or his counsel "conceded" that probable cause existed. Therefore, the Court rejects this argument outright.

[18] The Fourth Circuit's statement is topically at odds with the decision of the Supreme Court of Virginia in <u>Mosby</u>, <u>supra</u>, decided in 1911, wherein the court held that the record before it did not contain "evidence sufficient to rebut the prima facie evidence of probable cause consisting of the undisputed facts that after examining the witnesses the police justice sent the defendant in error on to the grand jury, and that the grand jury found true bills (two) of indictment against him, although he was afterwards acquitted of both." <u>Id.</u> at 521. In <u>Mosby</u>, however, the issue was not directly presented in the fashion that it is presented here, or as it was presented in <u>Westreich</u>, and the Court is satisfied that <u>Westreich</u> controls this case. It is indeed accurate to say that there is no <i>presumption</i> that probable cause existed at the time the prosecution was initiated. As reiterated in <u>Westreich</u>, the Supreme Court of Virginia explained in <u>Clinchfield Coal</u>, <u>supra</u>, decided after <u>Mosby</u>, that such a presumption is "an immaterial question" because "the burden is always on the plaintiff to negative the existence of [probable cause]." <u>Westreich</u>, 429 F.2d at 949 (quoting <u>Clinchfield Coal</u>, 96 S.E. at 843).

F.2d at 949. The Court of Appeals reasoned that whether an indictment is prima facie evidence of probable cause is irrelevant because the law "places such a heavy burden on the plaintiff in a malicious prosecution suit that the presumption is unnecessary." Westreich, 429 F.2d at 949 (citing Wiggs v. Farmer, 135 S.E.2d 829, 831 (Va. 1964)). As "the burden is always on the plaintiff to negative the existence of" probable cause, a presumption that probable cause exists is immaterial. Id. (quoting Clinchfield Coal, supra, 96 S.E. at 843). Therefore, a grand jury indictment is simply "pertinent evidence tending to show probable cause." Id.

The Defendants cite Brodie for the proposition that "[t]he prosecutor must believe in the guilt of the accused and there must be reasonable grounds on which to base the belief." Brodie, supra, 47 S.E.2d at 311. In so citing Brodie, the Defendants argue that the opinions and determinations of Assistant Commonwealth's Attorney Melissa Hoy, along with those of the magistrate, the preliminary hearing judge, and the Grand Jury, "are admissible in support of McGinnis' determination." Defs.' Mem. Supp. at 18. The argument lacks merit. First, just before the start of the trial, counsel for the Defendants agreed on the record that Melissa Hoy's and Officer Deveney's opinions that probable cause existed to arrest Bennett were *inadmissible*. Trial Tr. at 50:20 - 53:3 (Melissa Hoy and Officer Deveney "[c]an't give opinions, I agree

45

with that."). Second, a careful reading of <u>Brodie</u> reveals that the Defendants' reliance on the case is wholly misplaced.

The language in <u>Brodie</u> is a direct quotation from another work: PLEADING AND PRACTICE IN ACTIONS AT COMMON LAW, MARTIN P. BURKS 198 (2d ed. 1921).[19] A review of PLEADING AND PRACTICE shows clearly that the term "prosecutor" in this context is used not to refer to a government prosecutor, such as an Assistant Commonwealth's attorney, but rather to the malicious prosecution defendant, <u>i.e.</u>, the person who initiated the proceeding. <u>See</u> PLEADING AND PRACTICE at 196 ("It matters not who is the party on the record, the real *prosecutor* may be disclosed by parol evidence, and he will be held liable if the prosecution proceeded by his procurement or authority.") (emphasis added). Thus, <u>Brodie</u>, through PLEADING AND PRACTICE, indicates that the malicious prosecution *defendant*, not the Assistant Commonwealth's Attorney or a like government official, must believe in the malicious prosecution plaintiff's guilt. <u>Brodie</u>, therefore, in no way suggests that a government offical's belief in the guilt of the accused establishes, as a matter of law, that probable cause existed as would preclude a malicious prosecution claim.

---

[19] The quotation cited in <u>Brodie</u> is actually to page 251 of Burks's third edition of PLEADING AND PRACTICE, but the relevant language in the third edition is identical to the language of the second edition cited herein, and the Court did not have access to the full text of the third edition.

46

Finally, the Defendants suggest that, in <u>Trammel</u>, the United States Bankruptcy Court for the Eastern District of Virginia "allow[ed] [the] district attorney to testify regarding her belief as to the existence of probable cause." Defs.' Mem. Supp. at 18-19. Indeed, the Bankruptcy Court allowed an Assistant Commonwealth's Attorney to testify "that she made her own, independent determination that there was probable cause to press the Charges." <u>Trammell</u>, <u>supra</u>, 388 B.R. at 189. That, however, is the extent of the discussion of the prosecutor's opinion as to probable cause in <u>Trammell</u>. There is no discussion whatsoever of whether the prosecutor's opinion is prima facie evidence, or even just "pertinent evidence," that probable cause existed. This is significant because the <u>Trammell</u> court engaged in precisely such a discussion with respect to grand jury indictments and preliminary hearings. <u>Id.</u> at 191 (emphasizing the rule in Virginia that "the findings both at the preliminary hearing and before the grand jury are 'pertinent evidence' that probable cause did exist" (quoting <u>Westreich</u>, 429 F.2d at 949)). There is also no indication that the plaintiff in <u>Trammell</u> objected to the defendant's offering of the prosecutor's opinion testimony, thus the Court was never asked to determine whether such testimony was admissible. Hence, the fact that the testimony was given is irrelevant, and <u>Trammell</u> does not support the Defendants' position here.

47

This case is controlled by <u>Westreich</u>, and the findings of probable cause made by the grand jury and the magistrate are "pertinent evidence" that would support a jury's finding that a malicious prosecution defendant had probable cause to initiate the underlying criminal proceedings. Virginia courts do not appear to recognize that a government prosecutor's opinion testimony is "pertinent evidence" that should be admitted to inform the probable cause inquiry. Moreover, the Court properly instructed the jury on this issue,[20] and a reasonable jury could consider these findings "pertinent evidence" of probable cause, but need not, as a matter of law, find that probable cause existed because the findings were made.

Therefore, without weighing the evidence or considering the credibility of the witnesses, the Court concludes that Bennett did not fail to make a showing on this essential element of his case. Again, the record about the knowledge that McGinnis possessed at the time of the arrest decision, as previously detailed herein,

---

[20] The jury was instructed as follows:

In determining whether or not the defendant had probable cause, you also may consider the fact that a magistrate and a grand jury indictment found probable cause to believe that the plaintiff may have committed the crime for which he was arrested. In so doing, you should also consider whether the magistrate or the grand jury possessed the knowledge that the defendants possessed when initiating the charges against the plaintiff.

J.I. No. 25A.

provided a legally sufficient evidentiary basis for a reasonable jury to have found for Bennett as to the probable cause element of his malicious prosecution claim. Thus, the jury reasonably found a want of probable cause, even though the police, the magistrate, the grand jury, and the prosecutor all believed that probable cause existed to prosecute Bennett for embezzlement based on the information known to them.[21]

### (3) Malice

The Defendants also assert that Bennett failed to establish the element of "malice." In Virginia, "malice" means "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished."[22] Hudson, supra, 497 S.E.2d at 473. Virginia also recognizes that "[m]alice may be inferred from a lack of probable cause." Reilly v. Shepherd, 643 S.E.2d 216, 219 (Va. 2007). Malice can be inferred from a lack of probable cause, however, only when the circumstances of the case

---

[21] Whether those officials would have found probable cause if McGinnis had disclosed the lies that Spangler and Lowrey had told and his belief that they, indeed, were liars is of no import because Bennett proved a want of probable cause by a preponderance of the evidence.

[22] The jury was instructed on this point of law as follows: "Malice exists when the controlling motive for instituting criminal proceedings is any reason except a genuine desire to see justice done, to enforce the law, or to punish the guilty." J.I. No. 22.

49

support the inference.[23]  See Freezer v. Miller, 176 S.E. 159, 168

(Va. 1934); see also Pigg, supra, 152 S.E.2d at 276; Gaut v. Pyles,

181 S.E.2d 645, 647 (Va. 1971).

The Defendants' malice argument, though not articulated

precisely as such, is as follows: Bennett did not adduce evidence

of any improper controlling motive, so the jury must have inferred

malice from its finding of a lack of probable cause; however, a

lack of probable cause alone does not support an inference of

malice, and the circumstances of the case do not otherwise support

the inference; thus, the jury improperly presumed or imputed

---

[23] In denying the Defendants' initial Rule 50 motion for
judgment as a matter of law at the close of Bennett's case, the
Court explained that "[t]here [wa]s evidence from which a jury
could infer malice from the sequence of events."  Trial Tr. at
321:7-9.  The Defendants challenge this decision, arguing that
"[t]here is no authority supporting the standard" that malice can
be inferred from "the sequence of events."  Defs.' Mem. Supp. at
11.  The Defendants' argument is meritless, though, for "the
sequence of events" very clearly refers to "the facts and
circumstances" of the case and the probable cause determination,
the very factors upon which a malice inference can be based.  The
Court did not use a different or improper standard.

malice.[24]   Defs.' Mem. Supp. at 1, 10, 11.   For the reasons set forth below, the Defendants' argument fails.

The Defendants are correct in arguing that, in Virginia in a malicious prosecution suit, malice does not attach automatically when the absence of probable cause is shown.   It is indeed well-established that the "malice" required in a malicious prosecution case is not imputed as a matter of law by a simple showing of the absence of probable cause, but must be proven as a separate and distinct element of the plaintiff's claim.   Freezer, supra, 176 S.E. at 168.[25]   It is equally well-established, though, that legal

---

[24] The Court notes that the Defendants did not object to the relevant written instruction to the jury that read as follows: "Malice may be inferred from a lack of probable cause."   J.I. No. 22.   Further, when reading the instruction to the jury, the Court included the following additional explanation: "[Y]ou may, but you are not required to, . . . infer that malice has been established if you find that there has been a lack of probable cause."   Trial Tr. at 591:15-17.   Thus, the Court unambiguously explained to the jury that malice is not automatically presumed if probable cause did not exist, but is, rather, an allowable inference that the jury may choose to make or not make.   Finally, the Court had the following exchange on this precise issue with defense counsel:

THE COURT:   Malice can be inferred from a lack of probable cause, but a lack of probable cause cannot be inferred from malice.
[DEFENSE COUNSEL]: Correct.

Trial Tr. 303:23 - 304:1.   Counsel for the Defendants did not add any other qualifying language or otherwise suggest that the Court mischaracterized the controlling law in framing the instructions on the malice issue.

[25] The Court notes that the explanation in Freezer that "malice" as an element of a malicious criminal prosecution claim is "actual malice, or malice in fact," is simply the Supreme Court of Virginia's emphasis on distinguishing inferred malice from imputed malice.   Thus, to the extent that the Defendants argue that "legal

51

malice may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Id. In other words, the "[w]ant of probable cause is evidence of malice." Mosby, supra, 70 S.E. at 520.

The Defendants' argument that the "[l]ack of probable cause alone is insufficient to support an inference of malice," Defs.' Mem. Supp. at 12, fails as a matter of law. In Virginia, under certain circumstances, the want of probable cause alone *can* serve as legally sufficient evidence to support an inference of malice. See Pigg, supra, 152 S.E.2d at 276; see also Oxenham v. Johnson, 402 S.E.2d 1, 2 (Va. 1991). In these instances, "there [i]s *such* a want of probable cause" that an inference of legal malice is warranted. Pigg, supra, 152 S.E.2d at 276 (emphasis added) (The malicious prosecution defendant's "disregard of information communicated to him constituted an aggravated circumstance which supports the finding of the jury that there was such a want of probable cause as warranted an inference of legal malice."); Oxenham, supra, at 2 (The defendant's "lack of probable cause [alone] was sufficient to support an inference of [the defendant's] legal malice" where the defendant had "caused [an] arrest warrant to issue" against the plaintiff solely because the plaintiff had

---

malice" requires a showing of "actual malice," the Court rejects that argument outright.

refused to let the defendant search the plaintiff's residence without a search warrant.).

As the controlling decisions are applied to this record, a reasonable jury certainly could have determined that "there was such a want of probable cause" at the time McGinnis told the police that he wanted to press charges against Bennett as to warrant an inference of legal malice. Pigg, supra, 152 S.E.2d at 276. The fact that McGinnis decided to have Bennett arrested before the police were involved in any way and based solely on the word of witnesses whom he believed to be liars may reasonably be said to constitute the type of "aggravated circumstance" indicative of such a want of probable cause that an inference of legal malice was warranted. Indeed, the facts and circumstances behind the jury's finding of the want of probable cause are legally sufficient to support an inference of legal malice. In other words, the same facts and circumstances that counseled the jury toward a determination that probable cause did not exist may similarly have supported an inference that the Defendants acted with legal malice.

Again, "legal malice" is defined as "any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." Hudson, supra, 497 S.E.2d at 473. The Defendants argue that Bennett did not adduce "evidence of any motive other than a desire to catch a thief." Defs.' Reply Mem. at

4. The Defendants then ask, as a matter of law, "May a plaintiff establish malice without any evidence of a controlling motive and purely rely on inferring motive from a lack of probable cause?" While the Defendants answer the question in the negative, Defs.' Reply Mem. at 4, the Court answers the question in the affirmative.

As previously explained, legal malice may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Put differently, any controlling motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished may be proven by inference from a lack of probable cause if the circumstances of the case support the inference. Thus, an improper motive - legal malice - may be inferred where supported by the case's facts and circumstances. As such, the fact that Bennett did not label and identify explicitly an alleged improper motive, and the fact that the jury did not make an explicit finding as to precisely what they believed the Defendants' improper motive was, is of no consequence. The Court is not aware of any authority that requires otherwise.

Bennett showed facts and circumstances that were legally sufficient to support an inference that the Defendants acted with an improper motive based on the lack of probable cause. For example, the evidence of want of probable cause suggested that one such improper motive may have been a desire to see not that the

*guilty* were punished, but that *anyone* was punished. In other words, deciding to press charges against the first man accused by men believed by McGinnis to be untruthful criminals does not tend to demonstrate a good faith desire to see that the truly *guilty* individual is punished. It shows, instead, a bare desire to punish in general and to put an end to a frustrating investigation. That, of course, would be an improper controlling motive which would support a finding that the Defendants acted with legal malice.

Moreover, the record shows additional evidence probative of malice (apart from the want of probable cause). For example, McGinnis decided to have Bennett arrested without even examining Lowrey's criminal record (he was a convicted felon) and without ascertaining whether Spangler even could have been present to see what, on his third interview, he claimed to have seen. In fact, a check of company records would have disclosed that Spangler did not work on the evening in question. And, a check of the criminal records of the witnesses whom McGinnis thought to be liars would have shown that Lowrey had a felony conviction. And, the corroboration process would have shown that Bennett had no criminal record and was comfortably situated financially. Corroboration is most important when dealing with the testimony of known liars. Nor did McGinnis inform the police that he thought Lowrey was a liar or that Lowrey's version of events was merely the adoption of a story told by Spangler, another person McGinnis thought to be a liar.

And, McGinnis did not bring to the attention of the prosecutor or the Virginia courts the fact that Spangler's written story differed markedly on important points from the version adopted by Lowrey or that Lowrey had a felony conviction or that Spangler had not been at work on the evening at issue. Although those events occurred after Bennett had been arrested, the disclosure of all or any of them would have been important in deciding whether the arrest had been warranted. The failure to disclose them, therefore, is probative of the existence of a state of mind at the time of the arrest other than seeing that the guilty person would be punished. Furthermore, nothing in the record disclosed any reason that would have warranted the rush to judgment that was shown at trial. Nor was it shown that checking company work schedules and criminal backgrounds would have been difficult in the least. The failure to corroborate the evidence given by known liars and the failure to disclose pertinent information to the prosecutor or the courts, taken together (as well as in perspective of the want of probable cause), further support a finding that Bennett proved the malice element.

The jury may have inferred such a motive, or it may have inferred a separate, similarly legally sufficient motive from the underlying facts and circumstances or from the absence of probable cause. In either event, a legally sufficient basis existed for the jury's finding that the Defendants initiated the criminal

proceedings with malice. Therefore, without weighing the evidence or considering the credibility of the witnesses, the Court concludes that Bennett did not fail to make a showing on this essential element of his case, and the Defendants are not entitled to judgment as a matter of law.

### (4) **Terminated in a Manner Not Unfavorable to the Plaintiff**

The Defendants argue that the Court erred in determining that the Commonwealth of Virginia's decision to *nolle prosequi* the embezzlement charge against Bennett constituted a termination of the prosecution "in a manner not unfavorable to" Bennett.[26] They argue also that the proceeding has not terminated at all because the Commonwealth still has an intent to prosecute Bennett for the embezzlement if Lowrey ever surfaces. In their Rule 50(b) motion, the Defendants rely on <u>Nicholas v. Wal-Mart Stores, Inc.</u>, 33 F. App'x 61 (4th Cir. 2002) and <u>Niese v. Klos</u>, 222 S.E.2d 798 (1976).

In <u>Nicholas</u>, the plaintiff, a former Wal-Mart cashier, had been arrested on the complaint of Wal-Mart management, and charged with a breach of trust for allowing a customer to leave the store without paying for merchandise. The Fourth Circuit was tasked with interpreting the South Carolina Supreme Court's holding in <u>McKenney v. Jack Eckerd Co.</u>, 304 S.C. 21 (1991) that, "where an accused

---

[26] The Defendants request that this issue be certified to the Supreme Court of Virginia. The Court sees no merit in the Defendants' request because the issue is well-settled in Virginia law, as detailed herein.

established that charges were *nolle prossed* for reasons which imply or are consistent with innocence, an action for malicious prosecution may be maintained." In <u>Nicholas</u>, the Fourth Circuit "predict[ed]" that the South Carolina Supreme Court would find that plaintiffs asserting a claim for malicious prosecution have the *affirmative burden* of proving that the *nolle prosequi* was in fact entered under circumstances which imply or are consistent with innocence of the accused. <u>Nicholas</u>, <u>supra</u>, 33 F. App'x at 64-65. <u>Nicholas</u>, is, however, an *unpublished* Fourth Circuit case interpreting *South Carolina* law,[27] *predicting* what the *South Carolina* Supreme Court would hold. <u>Nicholas</u>, therefore, is in no way binding on this Court, and the Court does not find it persuasive in the least as to Virginia law.

In <u>Niese</u>, the Supreme Court of Virginia held that, "upon entry of the Nolle prosequi order, evidencing the unwillingness of the Commonwealth to proceed, the prosecution terminated in a manner not unfavorable to plaintiff for purposes of instituting a malicious prosecution action." <u>Niese</u>, 222 S.E.2d at 800-01 (citing <u>Graves v. Scott</u>, 51 S.E. 821 (1905) and <u>Keaton v. Balser</u>, 340 F. Supp. 329 (W.D. Va. 1972)). The Defendants argue that, under <u>Niese</u>, whether the Commonwealth's decision not to proceed is a "termination not unfavorable to the plaintiff" must be determined by "whether there was evidence of the Commonwealth's '[un]willingness . . . to

---

[27] While South Carolina and Virginia require similar elements for a malicious prosecution claim, the two are not identical.

proceed.'" Defs.' Mem. Supp. at 21 (quoting _Niese_, _supra_, 222 S.E.2d at 801). The Defendants, however, misread _Niese_.

A proper reading of _Niese_ reveals that the Court believed that the entry of a _nolle prosequi,_ in and of itself, evidences the Commonwealth's unwillingness to proceed with the prosecution at that time. The context of the _Niese_ holding does not indicate that the plaintiff has an affirmative burden to prove that the _nolle prosse_ in fact evidenced the Commonwealth's unwillingness to proceed, and an analysis of the cases upon which _Niese_ rests its holding - _Graves_, _supra_, and _Keaton_, _supra_, - confirms this interpretation.

In _Keaton_, the Western District of Virginia stated plainly that, "[s]ince the Commonwealth Attorney nolle prossed the warrant for leaving the scene of the accident on which the malicious prosecution claim in this action is based, it is apparent that the second element requiring termination in the plaintiff's favor has also been established." _Keaton_, _supra_, 340 F. Supp. at 332. In other words, the simple fact that the Commonwealth had _nolle prossed_ the underlying criminal charge satisfied the element requiring that the plaintiff show that the criminal prosecution terminated in a manner not unfavorable to him.

More importantly, in _Graves_, the Supreme Court of Virginia expressly considered and rejected both positions that the Defendants advance here. In _Graves_, the Court acknowledged that a

*nolle prosse* had at one point been perceived as failing to satisfy the "termination in a manner not unfavorable to" requirement of a malicious prosecution case because it "did not establish the innocence of the [malicious prosecution] plaintiff, or show want of probable cause on the part of the [malicious prosecution] defendant." Graves, supra, 51 S.E. at 822. Indeed, a *nolle prosse* and other forms of "termination" had been held not to have actually "terminated" the prosecution because, if no testimony had been heard that caused the criminal defendant to be discharged, it was not a "final termination." Id. However, the Supreme Court of Virginia expressly rejected that outdated reasoning and agreed with the more modern approach in recognizing that "a nolle prosequi ends the indictment past recall, and thereupon the right to a malicious prosecution suit is perfected." Id. at 823.

Since Graves, the only time Virginia courts have acknowledged that a *nolle prosse* can defeat a subsequent suit for malicious prosecution is if the *nolle prosse* was the result of a voluntary compromise between the then-criminal defendant and the Commonwealth. Andrews, supra, 585 S.E.2d at 787 ("A voluntary compromise ending a criminal prosecution defeats a subsequent suit for malicious prosecution."). Therefore, as Bennett's underlying criminal prosecution was not *nolle prossed* as a result of voluntary compromise, the termination of the criminal proceeding - the initial embezzlement charge - terminated the proceeding "past

recall," and it terminated the proceeding in a manner not unfavorable to Bennett as a matter of law. Accordingly, the Court will deny the Defendants' Rule 50(b) motion with respect to this issue.

## B. Punitive Damage Award

Quite remarkably, the Defendants argue that there was no evidence adduced at trial sufficient to support any punitive damage award. Alternatively, the Defendants argue that the $1,548,000 in punitive damages awarded to Bennett should be reduced to $350,000 pursuant to Virginia's statutory punitive damages cap.[28]

"Punitive damages are designed to punish offensive or unlawful conduct and deter it in the future." Wilkins v. Peninsula Motor Cars, Inc., 587 S.E.2d 581, 584 (Va. 2003). "The rule in Virginia is that in suits for malicious prosecution legal malice inferred from circumstances is sufficient to support an award of compensatory damages, but an award of punitive damages can be supported only by proof of *actual malice*." F.B.C. Stores, Inc. v. Duncan, 198 S.E.2d 595, 600 (Va. 1973) (emphasis added).

---

[28] The Defendants do not argue that R&L, as principal, did not ratify or adopt McGinnis's acts as R&L's agent such that it cannot be exposed to a punitive damage award. Thus, the Court need not reach the issue. That likely is because the jury could properly award punitive damages against R&L under the seminal Virginia case, Hogg v. Plant, 133 S.E. 759, 760 (Va. 1926) (holding that a principal could not be held liable for punitive damages unless the agent did something warranting punitive damages, and that such act was previously authorized or subsequently ratified by the principal).

In malicious prosecution actions, evidence of "misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others" is required to recover punitive damages. Oxenham, supra, 402 S.E.2d at 5 (quoting Pigg, 152 S.E.2d at 277). Actual malice "may be established by showing that the prosecutor's [e.g., the initiator - McGinnis] action was prompted by ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another." Lee v. Southland Corp., 244 S.E.2d 756, 759 (Va. 1978). Unlike *legal* malice, *actual* malice "cannot be inferred from a showing of want of probable cause," nor can it be "presumed or inferred from a mere mistake." Pigg, supra, 152 S.E.2d at 277. Thus, while Bennett established "legal malice" so that he can recover compensatory damages, he also must prove "actual malice" to recover punitive damages.[29]

---

[29] The jury was instructed on punitive damages, in pertinent part, as follows:

> If you find that the plaintiff is entitled to a verdict for actual or compensatory damages and if you further find that the act or omission which proximately caused actual injury or damages to the plaintiff was done maliciously or wantonly or oppressively, then you may, but are not required to, assess, in addition to any damages, such amount as you shall agree to be proper punitive damages. An act or failure to act is maliciously done if prompted by ill will or spite or grudge or by a desire to see another suffer. Here, unlike in the liability phase, actual malice cannot be inferred from lack of probable cause. An act or a failure to act is wantonly done, if done in a reckless or callous disregard of, or indifference to, the rights of another person or persons. An act or failure to act is

There is here no express evidence that the Defendants actually knew or believed that Bennett was innocent. Nor is there express evidence that the Defendants were prompted by spite, personal animosity, or some other markedly wicked intention. Actual malice, however, may still exist where there is "such recklessness or negligence as to evince a conscious disregard of the rights of others." Pigg, supra, 152 S.E.2d at 277. This type of "[w]ilful or wanton conduct imports knowledge and consciousness that injury will result from the act done." Id. To prove actual malice under this type of circumstance, "[i]ll will is not a necessary element . . . ." Friedman v. Jordan, 184 S.E. 186, 187 (Va. 1936).

Here, there is a legally sufficient evidentiary basis for a reasonable jury to have found "actual malice." At the absolute commencement of McGinnis's investigation, the evidence indicates that Finley gave McGinnis three names of people believed to have a special interest in computers: Mitchell, Spangler, and Lowrey. McGinnis, therefore, focused his preliminary investigation on these men. The initial shipping paperwork for the thirteen missing laptops also immediately focused McGinnis on Mitchell and Spangler, as neither could explain why one had reported that the shipment

---

oppressively done if done in a way or manner that injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power or taking advantage of some weakness or disability or misfortune of another person.

J.I. No. D.

arrived at the Richmond Terminal, while the other had reported that it did not. Further, McGinnis focused on Lowrey because he believed that Lowrey was deceptive, untrustworthy, and untruthful, commenting on Lowrey's suspicious mannerisms, his intentional lying "to take the heat off of him," and his lying about having no knowledge about the missing tower computers. McGinnis also thought that, in his first two interviews, Spangler was being untruthful and, of course, by changing stories in the third interview, Spangler obviously implicitly admitted that the first two stories were untrue. Moreover, the change of stories caused McGinnis to doubt Spangler's truthfulness as well.

Rather obviously, McGinnis then could not have Bennett arrested on the basis of Spangler's testimony alone. So McGinnis made the rather strange decision to feed Spangler's third version of events to Lowrey, a man McGinnis already believed to be a liar. After a heated exchange, Lowrey adopted Spangler's third version (by saying "that's the way it happened").

McGinnis then, just before accompanying Lowrey to his home to recover the stolen computer, instructed Finley to call the police to have them at R&L upon McGinnis's return even though, at the time, he believed that Lowrey was continuing to lie and knew where all three of the missing tower computers were. The party went to Lowrey's home where Lowrey again engaged in highly suspicious conduct by refusing to allow McGinnis into his home and then

64

produced only one of the three missing tower computers.  McGinnis
then returned to R&L.  While McGinnis claimed to have been wary of
Bennett's mannerisms and by his direct answers to questions (a
truly strange reaction) in his interview with Bennett, McGinnis did
not interview Bennett a second time.  McGinnis did not wait for the
police to interview Bennett on their own.  McGinnis did not seek to
recover the two remaining computers from Bennett's house.  He
called for Bennett's arrest.

And, as explained in discussing the malice element, McGinnis
did so without first trying to corroborate the stories told by the
liars on whose word he had decided to have Bennett arrested.  Had
McGinnis followed what would seem to be basic investigative
procedure (checking the company's work records and the criminal
history records of the witnesses and Bennett), he would have found
that Spangler's third version could not be true at all because he
did not work the night of the theft.  And, he would have found how
unreliable Lowrey really was because of a previous felony
conviction.  Nor did McGinnis tell the police that Spangler and
Lowrey had lied previously in the investigation.

The circumstances, as explained previously herein, illustrate
clearly that a reasonable jury could, and did, find a want of
probable cause.  The Fourth Circuit, analyzing Virginia malicious
prosecution law, has noted that, while the "lack of probable cause
alone does not infer actual malice, it does lend support to a

finding that the defendants acted with actual malice." <u>Stamathis</u> <u>v. Flying J, Inc.</u>, 389 F.3d 429, 441 (4th Cir. 2004) (internal citation omitted).

Here, that evidence, taken together with the rest of the record, would permit a reasonable jury to have determined that the Defendants acted with such recklessness and negligence as to evince a conscious disregard of Bennett's rights. The jury reasonably could have determined that the Defendants' seeking to have Bennett arrested prior to any police involvement based on Spangler's thrice-amended story, Lowrey's amended agreement with Spangler's story following McGinnis's feeding that story to Lowrey, without disclosing to the police the lies told by the key witnesses, without disclosing the fact that McGinnis had decided that Spangler and Lowrey were liars, and without corroborating the evidence offered by admitted liars and the rush to judgment shown here, was an act wantonly done with a reckless or callous disregard of Bennett's rights. Further, on the morning after Bennett's arrest, Mitchell admitted to McGinnis that Spangler had convinced him to come to talk to McGinnis and then gave a "*verbatim*" rendition of Spangler's story. The very next morning, though, McGinnis received a written statement from Spangler indicating that Lowrey *told* Spangler that Lowrey and Bennett stole the computers. This statement conflicted drastically with the stories previously told orally to McGinnis by Spangler and Mitchell, that Spangler had *seen*

Lowrey and Bennett steal the computers. The fact that McGinnis never alerted the police or the prosecutor or the courts to the existence of Spangler's handwritten statement constitutes additional evidence of actual malice and further support for a punitive damage award.

The Fourth Circuit has explained that "[a] person who places before a prosecuting officer information upon which criminal proceedings are begun, and who later acquires additional information casting doubt upon the accused's guilt, should be under an obligation to disclose his discovery to the prosecutor." Clarke v. Montgomery Ward & Co., 298 F.2d 346, 348 (4th Cir. 1962).[30] The Defendants contend that Spangler's subsequent written statement was not exculpatory in that it still implicated Bennett. However, the clear discrepancy between how Spangler allegedly came to know the information certainly "casts doubt" on Spangler's veracity. As the Court stated from the bench, Spangler's written statement "does cast doubt on [Bennett's] guilt because it is the version of the cardinal act that is radically at odds with what Mr. McGinnis reported, which apparently is what Mr. Spangler told him the first time. So it is a document that is in the possession of the defendants that impeaches, and in a material way, the very

_____

[30] The Defendants note that "the exculpatory evidence charge has been deleted from the current issue of the Virginia Model Jury Instructions." Post-Trial Mot. Hrg. Tr. at 52:2-7. The Defendants do not, however, purport to explain why the model instruction was removed. The Court knows of no changes in the prevailing law that would supplant the Clarke rule.

predicate for the action." Trial Tr. at 467:14-21. Relatedly, it was later learned that Spangler had not even worked the night of the theft - the night, according to one version of Spangler's story, he *saw* Bennett steal the computers – so that information also "casts doubt" on Bennett's guilt in that an absent employee clearly cannot witness a theft at the workplace. Like the discrepancy in Spangler's stories, the important evidence was never given to the police, the prosecutors or the courts dealing with Bennett's charges.

Therefore, the Defendants allowed the criminal prosecution of Bennett to continue despite unequivocally knowing that either the story Spangler relayed to McGinnis that McGinnis relayed to Lowrey and the police was false, or Spangler's handwritten statement was false, or both. Bennett's already untrustworthy accusers continued to contradict themselves, and Spangler, who initially indicated that he had seen Bennett stealing the computers, was ultimately shown not even to have been at work that night. Spangler's handwritten statement – effectively his fourth version of the story following three prior interviews with McGinnis – is fundamentally at odds with his and Mitchell's prior versions, and the Defendants failed to make any mention of it at any point during Bennett's criminal prosecution. At the very least, this was wilful and wanton conduct that is probative of the conscious disregard for Bennett's rights at the time he was arrested.

For all these reasons, therefore, there is a legally sufficient evidentiary basis for the jury's return of punitive damages. However, as a matter of law, the punitive damage award must be reduced to a total of $350,000. The Virginia Code provides as follows:

> the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000. The jury shall not be advised of the limitation prescribed by this section. However, if a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the maximum amount provided by this section.

Va. Code Ann. § 8.01-38.1 (West 2010). Thus, while the Court will deny the Defendants' motion for entry of judgment as a matter of law in their favor, the Court will grant the Defendants' motion to reduce the total punitive damage award to $350,000, as will be explained in more detail herein.

## II. The Defendants' Rule 59 Motion for a New Trial, or, Alternatively, for Remittitur

The Defendants also have moved, under Fed. R. Civ. P. 59, for a new trial or, alternatively, for remittitur. The granting or denial of a motion for a new trial under Rule 59(a) "is a matter resting in the sound discretion of the trial judge." Wadsworth v. Clindon, 846 F.2d 265, 266 (4th Cir. 1988) (citing Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne, 386 F.2d 193 (4th

Cir. 1967)). In reviewing such a motion, the Court may "weigh the evidence and consider the credibility of witnesses." Cline, supra, 144 F.3d at 301. The motion may be granted, "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Thus, a new trial will be granted if "(1) the verdict is against the clear weight of evidence, or (2) [the verdict] is based upon evidence which is false, or (3) [the verdict] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline, supra, 144 F.3d at 301.

The first two facets of the Rule 59 review standard "encompass[] a comparison of the factual record and the verdict to determine their compatibility." Atlas Food, supra, 99 F.3d at 594. Hence, "jury determinations of factual matters such as liability on a cause of action [and] liability for compensatory and punitive damages . . . will be reviewed by determining whether the jury's verdict is against the weight of the evidence or based on evidence which is false." Id. On the other hand, the jury's determination of the amount of punitive damages "is not a factual determination about the degree of injury but is, rather, an almost unconstrained judgment or policy choice about the severity of the penalty to be imposed, given the jury's underlying factual determinations about the defendant's conduct." Id. Thus, "[b]ecause the factual record

provides no direct foundation for the amount of punitive damages, a review of the size of the jury's award best utilizes the third prong of the Rule 59 review standard - whether the jury's award will result in a miscarriage of justice." Id. (citing Defender Indus., Inc. v. Nw. Mut. Life Ins. Co., 938 F.2d 502, 507 (4th Cir. 1991)); see also Cline, supra, 144 F.3d at 306.

The Defendants challenge the jury's liability verdicts as to the malicious prosecution action, compensatory damages, and punitive damages, but do not contend that the jury's verdict was based upon evidence which was false.[31]   The Defendants also challenge the *amount* of the jury's compensatory and punitive damage awards.   Finally, the Defendants contend that certain evidentiary decisions were "erroneous and prejudicial."

### A.   Liability Verdict

The Defendants argue that the jury's determinations that the Defendants (1) lacked probable cause, (2) acted with malice, (3) were liable for compensatory damages, and (4) were liable for punitive damages were against the clear weight of the evidence.[32] The Court will address the arguments in turn.

---

[31] Indeed, the Court would find that the jury's verdict was *not* based upon false evidence.

[32] The Defendants also argue that the jury's finding that Bullard and Finley instituted or cooperated in the prosecution was against the great weight of the evidence, but, given the previous ruling granting Rule 50 relief to those defendants, it is not necessary to review that argument.

### (1) Probable Cause

As previously discussed in detail herein, there was a legally sufficient evidentiary basis for a reasonable jury to find that the Defendants initiated Bennett's prosecution without probable cause. There is indeed strong factual support in the record - especially once the Court weighs the evidence - that probable cause did *not* exist at the time McGinnis indicated his desire to press charges against Bennett. In fact, the record, taken as a whole, supports the jury's finding on this element. Hence, the jury's verdict that probable cause did not exist is not against the clear weight of the evidence. The liability verdict does not warrant a new trial under Rule 59, and the Defendants' motion for a new trial with respect to this issue will be denied.

### (2) Malice

The Defendants contend that the jury's finding of legal malice was against the great weight of the evidence. As discussed previously herein, there was an ample evidentiary basis on which a jury reasonably could find that the Defendants acted with legal malice. Weighing the evidence, there is strong factual support in the record, by permissible inference and otherwise, that the Defendants' motive was not a good faith desire to see justice done, to enforce the law, to suppress crime, or to punish the guilty, and thus the jury's verdict that legal malice did exist is not against the clear weight of the evidence. The liability verdict does not

warrant a new trial under Rule 59, and the Defendants' motion for a new trial with respect to this issue will be denied.

### (3) Compensatory Damages

The Defendants contend that the jury's return of compensatory damages was against the great weight of the evidence. Compensatory damages are those damages "allowed as a recompense for loss or injury actually received and include loss occurring to property, necessary expenses, insult, pain, mental suffering, injury to the reputation, and the like." Pigg, supra, 152 S.E.2d at 276. Weighing the evidence, there is strong factual support in the record that the Defendants caused the Plaintiff to suffer pecuniary and emotional injury. The jury's verdict that the Defendants were liable for compensatory damages is not against the clear weight of the evidence. The liability verdict does not warrant a new trial under Rule 59, and the Court will deny the Defendants' motion for a new trial with respect to this issue.

### (4) Punitive Damages

The Defendants contend that the jury's return of punitive damages was against the great weight of the evidence. As discussed previously herein, there was a legally sufficient evidentiary basis for a reasonable jury to find that the Defendants were liable for punitive damages. Weighing the evidence, there is strong factual support in the record that the Defendants acted with *actual* malice such that a return of punitive damages is warranted. The jury's

verdict that the Defendants were liable for punitive damages is not against the clear weight of the evidence. The punitive award liability verdict does not warrant a new trial under Rule 59, and the Court will deny the Defendants' motion for a new trial with respect to this issue.

## B.  Amount of Damages

### (1)  Amount of Compensatory Damages

In malicious prosecution actions, "the jury is regarded as the best and safest tribunal to determine the measure of damage." Pigg, supra, 152 S.E.2d at 276.  In this case, the jury awarded Bennett $1,716,920 in compensatory damages.  The award did not include an injury-specific monetary breakdown.[33]  Bennett adduced evidence at trial that he suffered pecuniary damages in the following amounts:  (1) $7,019 in criminal defense legal fees; (2) $81,222.48 from a depleted retirement fund; (3) $28,000 from a depleted annuity account; (4) $142,100 in lost wages; and (5) $298,880[34] in future earnings.  Bennett also put on non-pecuniary

_____

[33] Neither party requested a special verdict form that would have required the jury to specify particular award amounts attributed to particular injuries suffered. Indeed, they agreed to the form of the verdict. The jury returned a simple lump sum compensatory damages verdict of $1,716,920.

[34] The parties improperly refer to a figure for lost future earnings of $332,800. This figure was erroneously derived by approximating Bennett's Social Security retirement age as sixty-seven and by approximating Bennett's age at the time of trial as fifty-four. As explained previously, Bennett testified that his Social Security retirement age is sixty-six years and two months. Upon the return of the verdict on December 2, 2009, Bennett, who was born on June 4, 1955 – a date known both to the jury and the

74

damage evidence, but he did not assign a dollar amount to such damages. It appears, therefore, that the jury returned the remaining $1,159,698 of the compensatory award for non-pecuniary damages.

The Supreme Court in <u>Gasperini v. Ctr. for Humanities, Inc.,</u> 518 U.S. 415 (1996) addressed the appropriate standard under which a district court must evaluate a Rule 59(a) motion for a new trial based upon the alleged excessiveness of the jury's compensatory damage award. See <u>Gasperini</u>, <u>supra</u>, 518 U.S. at 438-39. The Supreme Court determined that, because the doctrine of <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938), "precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court," <u>Gasperini</u>, 518 U.S. at 430-31, a district court sitting in diversity must apply state law standards when it considers a Rule 59(a) motion for a new trial based upon the alleged excessiveness of the jury's compensatory

---

Court from Bennett's criminal background check (Pl.'s Ex. 8, admitted into evidence, Trial Tr. at 220:6-12) - was 54 years, 5 months, and 29 days old. Thus, the lost future earnings period was not, as the parties approximated, 13 years, but was, instead, precisely 11 years, 8 months, and 3 days, or 11.675 years. Bennett's assumed gross income from R&L over this 11.675-year period based on his pre-termination salary ($41,600 per year) would have been $485,680. The Plaintiff's assumed post-termination gross income ($8 per hour, 40 hours per week, 50 weeks per year) over the same 11.675-year period would be $186,800. The difference between these two figures (<u>i.e.</u>, Bennett's lost future earnings) is $298,880.

damage award.[35] See id. at 438-39; see also Konkel, supra, 165 F.3d at 280 (interpreting Gasperini).

In Virginia, "if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge, acting within his legal authority, to correct the injustice." Rutherford v. Zearfoss, 272 S.E.2d 225, 227-28 (Va. 1980) (quoting Smithney v. Refining Co., 122 S.E.2d 872, 876 (Va. 1961)). The analysis will address the various compensatory damage amounts in turn.

### (a) Criminal Defense Legal Fees

Bennett introduced an invoice for legal services and costs related to his criminal defense for the underlying embezzlement charge in the amount of $7,019.18. The Defendants challenge the legal fee award as having not been shown to be reasonable, note

---

[35] The Court notes that subject matter jurisdiction properly existed in this case going into trial under both 28 U.S.C. § 1331 and § 1332. Given that the federal claim did not survive the trial, and that the damage award at issue relates to the state claim, the Court will analyze the award under the Virginia approach as if the Court sat purely in diversity. The result would not be different in this case, however, if the Court were to undertake the federal approach, as the compensatory damage verdict is not against the clear weight of evidence and will not result in a miscarriage of justice.

76

that it was partially redacted, and suggest that it should be reduced to $2,626.69. The Defendants did not put on any evidence suggesting that it was not a fair representation of the expenses incurred by Bennett, and there is no reason to doubt the $7,019 figure as being reasonable and accurate. This award certainly does not shock the conscience. Nor does it demonstrate that it was influenced by passion, corruption, or prejudice, or that it was based on a misunderstanding of the facts or law. It is not disproportionate to the injuries suffered. Accordingly, an award of $7,019 for criminal defense legal fees and costs does not support the granting of a new trial.

### (b) Retirement Fund and Annuity Account

As a result of having lost his job, and thus his income, Bennett was forced to deplete his retirement fund and his annuity account. The Defendants challenge the award of $81,222.48 for the retirement fund and $28,000 for the annuity account as being a "double recovery" because of the lost wage award and they suggest that both should be reduced to zero. This "double recovery" argument posits that Bennett's having recovered lost wages fully compensates him for the money spent from his savings accounts. Obviously, this argument fails. Were it not for his termination from R&L, Bennett would have both the money in the now-depleted accounts *and* his lost wages. The Defendants did not put on any evidence that the $81,222.48 and $28,000 figures were not a fair

77

representation of the amount of funds in Bennett's accounts at the time of his termination. An award for these sums does not shock the conscience, does not demonstrate that it was influenced by passion, corruption, or prejudice, was not based on a misunderstanding of the facts or law, and is not disproportionate to the injuries suffered. Accordingly, awards of $81,222.48 for the retirement fund and $28,000 for the annuity account do not support the granting of a new trial.

### (c) Lost Wages

The Defendants do not challenge the $142,100 lost wages award beyond the meritless "double recovery" argument, and there is no indication that this compensatory award was returned against the great weight of the evidence. The jury's finding of liability clearly justifies an award of lost wages, and the award made does not shock the conscience, does not demonstrate that it was influenced by passion, corruption, or prejudice, was not based on a misunderstanding of the facts or law, and is not disproportionate to the injuries suffered. Accordingly, the award of $142,100 in lost wages does not support the granting of a new trial.

### (d) Lost Future Earnings

The Defendants challenge an award of $298,880 in lost future earnings for the remaining 11.675-year period before Bennett would retire and draw Social Security payments. The $298,880 figure derives from taking the $8.00 per hour salary that Bennett was

earning at the time of trial and projecting it out for forty hours per week for fifty weeks per year for thirteen years and subtracting that from Bennett's pre-termination salary of $41,600 over the same 11.675-year period. In other words, the figure is the difference in the gross income that Bennett alleges he would have received at his Social Security retirement age of sixty-six and two months between his pre-termination salary and a post-termination salary wherein Bennett would obtain full-time employment at the same rate of pay he earned part-time at the time of the trial with two weeks of unpaid vacation per year.[36]

Virginia law "requires anticipated lost income to be proved with reasonable certainty." ITT Hartford Group, Inc. v. Va. Fin. Assocs., Inc., 520 S.E.2d 355, 360 (Va. 1999). "In order to form a reliable basis for a calculation of lost future income or loss of earning capacity, such evidence must be grounded upon facts specific to the individual whose loss is being calculated." Vasquez v. Mabini, 606 S.E.2d 809, 811 (Va. 2005). These "[d]amages need not be established with mathematical certainty." Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC, 661 S.E.2d 467, 472 (Va. 2008). However, "[e]stimates of damages based entirely upon statistics and assumptions are too remote and speculative to meet [the reasonable certainty] test." Bulala v. Boyd, 389 S.E.2d 670, 677 (Va. 1990).

---

[36] See note 33, supra, pp. 74-75.

The lost future earnings damages awarded, though certainly not established to a mathematical certainty, were proven to a reasonable certainty and were grounded upon facts specific to Bennett. Virginia courts recognize that, "[o]rdinarily, the wages a person earned prior to an injury are an indicator of the person's income and earning capacity in the future." Hodges v. Norfolk So. Ry. Co., No. CL97-805, 2001 WL 34038119, at *1 (Va. Cir. Ct. Aug. 16, 2001). Thus, it is reasonable to use Bennett's pre-termination salary as an indicator of what his future income would have been but for his arrest and termination. Additionally, as the Supreme Court of the United States notes, because the length of the "lost stream" of future income "cannot be known with certainty" given that a worker could be disabled or killed at any time, "litigants frequently follow the relatively simple course of assuming that the worker would have continued to work up until a specific date certain." Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 534 (1983). Here, that date certain was Bennett's Social Security retirement age of sixty-six and two months, and it is reasonable to use an 11.675-year lost future earnings period representing the time from the date of the trial until Bennett reached the age of sixty-six and two months.

Further, the jury heard that Bennett, before his termination from R&L, earned $41,600 annually. Bennett had worked regularly for most of his life, but despite contacting approximately 100

prospective employers, Bennett had been unable to procure full-time employment in the more than three-and-one-half years between his termination and the date of the trial. He had, however, begun to earn $8 per hour, twenty hours per week, or $8,000 per year on a fifty-week annual work schedule. Therefore, given the length of time it took Bennett to obtain even part-time work notwithstanding his reasonable effort to find work, and given that Bennett will continue to have to report to each prospective employer that he was terminated by R&L because he was accused of stealing from the company, Bennett proved with reasonable certainty that he will earn no more than $16,000 per year for the next 11.675 years. The field of work where he would stand to earn the most money based on his experience - freight - is likely the field in which he has the least likelihood of obtaining a job based on his termination for accused theft with R&L.

Thus, the jury, using the evidence and its common sense, reasonably could have determined that Bennett suffered reasonably certain lost future wages in the amount of $298,880. The Defendants' arguments to the contrary are without merit,[37] and the jury's award does not support the granting of a new trial.

---

[37] The Defendants fail to cite any Virginia law on the subject and cite only federal authority analyzing federal statutes and cases with no factual similarities to the proof offered in this case.

### (e) Non-pecuniary Damages

The Defendants challenge the non-pecuniary aspect of the compensatory damage award ($1,159,698) as shocking to the conscience and unsupported by the facts. The Defendants suggest that the non-pecuniary award should be reduced to $142,100, focusing their argument on Bennett's testimony that he is not aware of anyone who thinks less of him as a result of his arrest. As they must, the Defendants concede that damage to one's reputation is presumed in a malicious prosecution suit and that no special proof of harm is required, so the proper award is left in the discretion of the jury. However, the Defendants rightly assert that such discretion can be abused. And, they say, it was abused here. The Court disagrees.

A malicious prosecution plaintiff may recover non-pecuniary compensatory damages for "insult, pain, humiliation, mental suffering, injury to the reputation, and the like." Weatherford v. Birchett, 164 S.E. 535, 537 (Va. 1932). Even where a "verdict seems large, and is greater than [the Court] would have been willing to assess had [it] been on the jury," if the plaintiff is entitled to recover on his cause of action and the damages were "supported by abundant proof," the Court should not find the jury was actuated by passion, prejudice, or a mistaken view of the case. Id. In this case, $1,159,698 does indeed seem a large non-

pecuniary damage award.    However, abundant evidence existed to

support the sum.

Bennett labored since his termination from R&L to find full-

time employment, attempting both to start his own business and to

work with one of around 100 prospective employers.    His efforts

failed, and despite ultimately obtaining part-time work with his

brother, Bennett was forced to change his lifestyle significantly.

He could no longer afford the apartment he had shared with his

girlfriend and her daughter, and, as a man in his fifties, was

forced to move in with his father after having lived on his own for

over thirty years.    It was reasonable for the jury to conclude

that, as Bennett argued, that was a demoralizing and humiliating

circumstance that had persisted for more than three years.

After the humiliation of being escorted by many of his co-

workers eating lunch at R&L in handcuffs, Bennett suffered the

embarrassment of having to tell his family, friends, and perhaps

most importantly, prospective employers that he was arrested and

that his employment was    terminated because he was accused of

stealing.    Because of his reduced financial stability and lack of

employer-provided medical benefits, Bennett lives in fear of

contracting an illness he will be unable to pay to combat.

Unsurprisingly, he thinks daily about his arrest and worries that

his financial situation may leave him without adequate food and

shelter.    His brothers described Bennett, once a happy and easy-

going man, as having become quiet, secluded, devastated, and withdrawn from his family and others as a result of the arrest and prosecution. The Defendants offered no proof that Bennett did not suffer any of these non-pecuniary damages.

Even though Bennett is not personally aware of anyone who thinks less of him as a result of his arrest, the amount of non-pecuniary damages returned in Bennett's favor is appropriately significant. Reputational injury is only one component of the non-pecuniary damage inquiry, and the precise dollar figure to assign to Bennett's non-pecuniary damages was within the discretion of the jury. The jury saw that Bennett had been humiliated and demoralized both on the day of his arrest and for years thereafter, and wrongfully so. It saw that Bennett had endured mental suffering and distress, and needlessly so. It saw that his ability to provide for basic needs such as housing and insurance had been severely diminished, and, that his personal relationships had been seriously altered as a consequence of the wrong done by the Defendants. On this record, an award of $1,159,698 (which is only two times Bennett's proved pecuniary damages) is not so excessive that it shocks the conscience, does not demonstrate that it was influenced by passion, corruption, or prejudice, was not based on a misunderstanding of the facts or law, and is not disproportionate to the injuries suffered. Again, the Defendants' arguments to the

84

contrary are without merit.[38] Accordingly, the non-pecuniary damage
award does not support the granting of a new trial.

### (f) Amount of Compensatory Damages Conclusion

Neither party requested a special verdict form; so the jury
returned a lump sum compensatory damages verdict of $1,716,920.
But, as the foregoing discussion establishes, the jury reasonably
*could have* returned awards in the amounts described as to each
particular injury that Bennett claimed. In other words, sufficient
evidence existed such that the assumed individualized amounts are
themselves legally supportable, and, together, the awards of
compensatory damages in the amounts discussed do not shock the
conscience, do not demonstrate that the verdict was influenced by
passion, corruption, or prejudice, were not based on a
misunderstanding of the facts or law, and were not disproportionate
to the injuries suffered. Further, the verdict did not establish
that the jury included in its damages anything not awardable in
Virginia for malicious prosecution. Therefore, cumulatively, the
jury's compensatory damages award of $1,716,920 does not support
the granting of a new trial.

---

[38] The Defendants cite Fourth Circuit cases discussing: (1)
statutory emotional distress damages under the Privacy Act (Doe v.
Chao, 306 F.3d 170 (4th Cir. 2002)); (2) humiliation and mental
distress damages under the Fair Credit Reporting Act (Sloane v.
Equifax Info. Servs., LLC, 510 F.3d 495 (4th Cir. 2007)); and (3)
emotional distress damages under § 1983 of the Civil Rights Act
(Price v. City of Charlotte, N.C., 93 F.3d 1241 (4th Cir. 1996)).
None of these cases is controlling or persuasive on the issues
presented in this case.

### (2) Amount of Punitive Damages

In the case at bar, the jury awarded Bennett punitive damages in the amount of $1,500,000 against R&L, $3,000 against Finley, $15,000 against Bullard, and $30,000 against McGinnis. Preliminarily, given that Finley and Bullard were not liable for malicious prosecution as a matter of law, no punitive damage verdict may be sustained against them, and the Court will alter the judgment accordingly. As discussed above, however, there was a legally sufficient evidentiary basis for the jury's return of punitive damages against R&L and McGinnis, and the award made was not factually against the clear weight of the evidence. Thus, at issue is whether the amount of the punitive damage awards against R&L and McGinnis warrant the granting of a new trial. As previously explained, the jury's determination of the amount of punitive damages is not a factual determination about the degree of injury, so the Court will review the size of the jury's punitive damage award under the third facet of the Rule 59 review standard - whether the jury's award will result in a miscarriage of justice. See Atlas Food, supra, 99 F.3d at 594.

Additionally, "[a]bsent any constitutional challenge to the amount of a jury's punitive damage award, a federal district court reviews such an award by applying the state's substantive law of punitive damages under standards imposed by federal procedural law." Id. at 593 (internal citation omitted). The Defendants have

asserted no constitutional challenges here,[39] so the task is to "determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." Id. Thus, the Court must: (1) determine if the jury's punitive damages verdict in this case is within the confines of Virginia law; and (2) determine whether the verdict will result in a miscarriage of justice under Rule 59.

### (a) Analysis Under Virginia Law

In Virginia, judicial review of the amount of punitive damages requires: (1) consideration of reasonableness between the damages sustained and the amount of the award; (2) the measurement of punishment required; (3) whether the award will amount to a double recovery; (4) the proportionality between the compensatory and punitive damages; and (5) the ability of the defendant to pay. Baldwin v. McConnell, 643 S.E.2d 703, 707 (Va. 2007). "The general rule is that there is no fixed standard for the measure of exemplary or punitive damages and the amount of the award is largely a matter within the discretion of the jury." Id.

Here the punitive damages are reasonable in light of the wrongful conduct engaged in by the Defendants and in consideration

---

[39] In their oral motion made immediately after the return of the verdict, the Defendants made the conclusory assertion that the verdict was unconstitutional. Trial Tr. at 702:12-13. However, in their written motion and in oral argument, the Defendants never pursued that assertion.

of the damages they inflicted on Bennett. The amounts returned
against R&L and McGinnis represented highly-reasoned calculations
to punish based on demonstrated culpability and net worth. The
parties stipulated that R&L's net worth was $17,492,313 and that
McGinnis's net worth was $150,000.[40] Trial Tr. at 668:3-13. The
punitive damage award of $1,500,000 as to R&L represents a verdict
that is 8.58% of the company's net worth. The punitive damage
award of $30,000 as to McGinnis represents a verdict that is 20% of
his net worth.[41] These figures represent an appropriate measurement
of punishment under the circumstances. The award will not amount
to a double recovery, and the total punitive award of $1,548,000
(which included awards against Finley and Bullard totaling $18,000)
is highly proportional to the total compensatory award of
$1,716,920, as the punitive award amounts to 90.16% of the
compensatory award. Finally, both R&L and McGinnis have the
ability to pay the full amounts returned against them given that
both amounts were well under their respective net worths; however,
neither will have to pay the full amount.

---

[40]In closing argument, Bennett's counsel suggested the rather
modest approach of assessing punitive damages of no more than five
to ten percent of the Defendants' net worth when addressing the
Defendants' ability to pay and considering the nature of the
Defendants' actions. Trial Tr. at 668:16-21.

[41]The award against Bullard represented 15% of his $100,000 net
worth, and the award against Finley represented 10% of his $30,000
net worth. Clearly, therefore, the jury believed McGinnis to be
most culpable, followed in incremented succession by Bullard, then
Finley, and finally R&L.

88

As explained previously, the Virginia Code requires that the *total* amount awarded for punitive damages be reduced to $350,000. See Va. Code Ann. § 8.01-38.1 (West 2010). The total punitive damage award without the awards against Bullard and Finley equals $1,530,000. The Virginia statutory cap of $350,000 represents a sum that is 22.88%[42] of the $1,530,000 punitive total. Thus, the Court will reduce proportionally the punitive awards with respect to R&L and McGinnis to comport with the cap as follows: $343,137.25 against R&L[43] and $6,862.75 against McGinnis.[44] These reduced awards represent 1.96% and 4.56% of R&L's and McGinnis's net worth, respectively. As reduced (indeed before the reduction), the jury's punitive damages verdict is within the confines of Virginia law.

### (b) Analysis Under Rule 59

Having found that the punitive damages verdict comports with Virginia law, the Court must next determine whether the verdict will result in a miscarriage of justice under Rule 59. "The miscarriage-of-justice standard recognizes the hybrid nature of punitive damage awards" in that "some considerations underlying the *amount* of a punitive damage award may be factual . . . and,

---

[42] The more precise figure is 22.875816993464052%, but the Court will refer to this figure as "22.88%" for the sake of brevity.

[43] 22.88% of the $1,500,000 punitive damage award returned against R&L equals $343,137.25.

[44] 22.88% of the $30,000 punitive damage award returned against McGinnis equals $6,862.75.

89

therefore, would be well suited to the jury's role of finding facts," while "other policy-related elements . . . are not factual questions and, therefore, are more appropriately decided by the trial judge." Atlas Food, supra, 99 F.3d at 594. Thus, "[t]he judge's unique vantage point and day-to-day experience with such matters lend expertise and consistency." Id. The Fourth Circuit has explained that

> punitive damage determinations involve a partnership between a jury and trial judge, each with a comparative institutional advantage, in which the judge inevitably enjoys the final word. While a district court must give due respect to a jury's comparative advantages in initially deciding upon the amount of punitive damages to award, the court may depart from that award to the extent that it concludes that its own comparative advantages warrant such a departure. Accordingly, we conclude that while a jury is authorized to award punitive damages on a framework of liability and the factors supplied by state law, the judgment a jury makes as to the amount is reviewable by federal trial courts under Federal Rule of Civil Procedure 59 less deferentially than are factual findings which may be measured against the factual record. The court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice.

Id. Applying the foregoing principles, the Court concludes that the jury's punitive damage award was not so excessive as to work an injustice. The facts and circumstances of this case, along with policy-related considerations, warranted a return of punitive

damages. The jury's punitive award neither creates a miscarriage of justice nor offends any notion of fairness or justice. Hence, granting of a new trial is not justified.

Indeed, the rush to judgment and the decisions to press an arrest on the uncorroborated evidence given by known liars, and the withholding of exonerating evidence from the police and the state court all support the imposition of punishment. And, the award also serves a deterrent purpose. Perhaps, in the future R&L and McGinnis will not be so quick to close a case, and perhaps they might fairly, objectively and fully conduct an investigation before having someone arrested. In other words, the punitive award should also deter wrongful conduct on future theft investigations at R&L. And, if after checking for corrobative evidence, they determine that the word of a witness is confirmed to be of no value, they perhaps will refrain from pressing charges. And, if they do press charges and then, shortly thereafter, come across exonerating evidence, they will share it with the police and the courts.

This case clearly involved a miscarriage of justice but not the one of which the Defendants complain. The miscarriage, in fact, was visited on Clyde Bennett. The record shows clearly the miscarriage reflected in the jury's verdicts. Counsel for the Defendants expressed profound, numbing shock when the verdict was returned. That may be how the defendants and counsel felt. But, that reflects that they were (and remain) tone deaf to the wrongs

proved by the record and to the damage those wrongs visited upon Clyde Bennett. This record shows beyond question that the verdict of the jury visited no miscarriage of justice on the Defendants.

For all the foregoing reasons, the Defendants' motion for a new trial as to this issue, will be denied but the punitive awards against R&L and McGinnis will be reduced to $343,137.25 and $6,862.75, respectively, to comport with Virginia's statutory cap.

## B. Evidentiary Rulings

The Defendants argue that the Court should order a new trial because it: (1) precluded Hoy from testifying as to her opinion related to probable cause and intent to prosecute Bennett in the future; (2) limited the use of the purported statements by Mr. and Mrs. Spangler to McGinnis to be considered only as to McGinnis's state of mind on the issue of *malice*; and (3) allowed Wayne Spratley (another dockworker) to testify that Lowrey had told him Lowrey planned to steal the computers. It is well-established that errors in the admission or rejection of evidence may be grounds for a new trial. See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). However, Fed. R. Civ. P. 61 provides that "no error in admitting or excluding evidence . . . is ground for granting a new trial" unless the error "affect[s] a[] party's substantial rights." Fed. R. Civ. P. 61; see Ingram Coal Co. v. Mower, L.P., 892 F.2d 363, 366 (4th Cir. 1989) ("[A] court at every stage of the proceeding must disregard any error or defect in the proceeding

92

which does not affect the substantial rights of the parties.").
Thus, it is only errors that cause substantial harm to the moving
party that justify a new trial, and errors that are not prejudicial
do not necessitate a new trial.  Each evidentiary ruling will be
addressed in turn.

### (1) Melissa Hoy's Testimony

The Defendants argue that the decision to prohibit Assistant
Commonwealth's Attorney Melissa Hoy from testifying about the basis
for prosecuting Bennett and her future intention to prosecute
Bennet was erroneous and prejudicial. Specifically, the Defendants
argue that the Court improperly discounted the significance of
Hoy's decision that probable cause existed, asserting that such
evidence is viewed as proper in Virginia courts and the Fourth
Circuit.  The Defendants believe that the limitation resulted in an
unfair imbalance in the eyes of the jury because it allowed an
inference that there was no basis to the charge at the time of
arrest and no grounds for continuing prosecution after arrest.   In
support of this position, the Defendants cite Brodie, supra,
Trammel, supra, and Goodwin v. Metts, 885 F.2d 157 (4th Cir. 1989).

As explained previously, counsel for the Defendants agreed at
trial that Melissa Hoy could not testify as to her opinion that
probable cause existed to arrest Bennett.  Trial Tr. at 50:20 -
51:17 (Melissa Hoy "[c]an't give opinions, I agree with that.").
Additionally, as explained previously, the Defendants improperly

93

cite Brodie, supra. Also, Trammel and Goodwin are simply cases wherein a court admitted a government prosecutor's testimony. Neither holds, nor even hints, that such testimony *must* be admitted, or that the exclusion of such evidence is prejudicial error.

Further, district courts are charged with "prevent[ing] jurors from giving undue weight to . . . lay [opinion] testimony." United States v. Baptiste, 596 F.3d 214, 225 (4th Cir. 2010). Here, the Defendants had not designated Melissa Hoy as an "expert," yet her expertise is making probable cause determinations and prosecuting crimes. The likelihood of juror confusion and prejudice far outweighed the probative value of the testimony, and it is within the Court's discretion to admit evidence following an appropriate Rule 403 balancing. This balancing favored the testimony's exclusion, and the Court finds no error in precluding the prosecutor's testimony under the circumstances. The emphasis in Westreich and supporting cases is on the pertinency of *grand jury* and *magistrate* findings, not prosecutor findings. To the extent that Trammell and Goodwin are cases wherein a government prosecutor testified as to her probable cause determination, neither discusses the proper admissibility of such testimony, much less holds that the testimony is controlling evidence of the existence of probable cause.

Finally, the fact that Hoy apparently still intends to prosecute Bennett if Lowrey is located is irrelevant to the "termination" element of a malicious prosecution suit, for, as explained previously, Virginia recognizes that a *nolle prosse* terminates *that* proceeding in a manner not unfavorable to the Plaintiff past recall. Accordingly, the Court's having limited Hoy's testimony was not error and does not warrant the granting of a new trial.[45]

### (2) McGinnis's Conversations with the Spanglers

The Defendants contend that, in limiting the use of the purported statements made by Mr. and Mrs. Spangler to McGinnis related to Mr. Spangler's having allegedly seen Bennett and Lowrey stealing the computers, the Court acted erroneously and prejudicially. The Court instructed the jury that the testimony was hearsay and could be considered only as to McGinnis's state of mind on the issue of *malice*. The Defendants contend that it should also have been admissible as to the issue of *probable cause*.[46]

---

[45] Even if the limitations were error, the Court would find that the rulings did not prejudice the Defendants' substantial rights such that a new trial still would not be warranted. And, given the evidence that this trial produced, it is inconceivable that a prosecutor would continue to press the case against Bennett for no reasonable jury would convict if given all the information that came to light here.

[46] The Defendants also argue that the testimony is not hearsay because McGinnis was "recounting portions of his report" that was admitted into evidence. Defs.' Mem. Supp. at 28. The Court rejects that argument outright, however, as McGinnis was clearly testifying as to his memory of the relevant events, not the contents of his report.

A new trial motion based on either an improper instruction to the jury or the alleged improper exclusion of testimony from the jury's consideration requires a proper objection at trial. 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §§ 59.13[2][b][i][E], 59.13[2][b][i][B] (3d ed. Lexis 2010). In this case, at trial, counsel for the Defendants specifically said that both Mrs. Spangler's statements and Mr. Spangler's statements were "hearsay," Trial Tr. at 390:18-22. Further, counsel said explicitly that he was offering the testimony "as far as the malice and state of mind is concerned as to what they did and why they did it." Trial Tr. at 390:7-14. In other words, as the Court explained, the Defendants offered McGinnis's testimony related to the Spanglers' statements to "show [McGinnis's] state of mind and whether he was operating with malice or not." Trial Tr. 392:6-10. The Defendants did not object to the limiting instruction given to the jury at the time; indeed, the Court gave the Defendants the ruling they requested. Accordingly, the Court's limitation was not error, and the ruling did not prejudice the Defendants' substantial rights. Therefore, the Court will deny the Defendants' motion for a new trial with respect to this issue.

### (3) Spratley's Testimony

At trial, Wayne Spratley testified that Lowrey "rode up to [him] . . . on the fork lift and said there were some computers he was going to take." Trial Tr. at 189:13-15. Spratley testified

that he then "kind of looked at [Lowrey] and said, how are you
[g]oing to do that?," to which Lowrey responded, "I am going to
take them right out the front door. It is Friday, and Friday
[there] is only like one supervisor there." Trial Tr. at 189:15-
19. Lowrey then intimated to Spratley that "basically, Clyde
[Bennett] would be too busy to watch him" take the computers "out
the front door." Trial Tr. at 189:19-21. Spratley never told
anyone of this conversation because he did not believe Lowrey.
Trial Tr. at 189:25 - 190:9.

The Defendant objected to this testimony as impermissible
hearsay. Bennett's counsel apparently agreeing that the testimony
was hearsay, argued that the statement was not being offered for
the truth of the matter asserted but was, instead, being offered
for "a non-hearsay purpose to show the lack of a quality
investigation and to show a lack of reliability that a reasonable
person would find based on the information to be supplied, in part,
as a result of the answer to this question." Trial Tr. at 178:6 -
179:1. Essentially, Bennett's theory was that R&L easily could
have identified and interviewed all of the dock workers in the four
days that McGinnis was in Richmond and that failure to do so
illustrates an improper rush to judgment. Trial Tr. at 182:18 -
183:2. In other words, Bennett contended that the evidence was
admissible to show malice (a motive other than a good faith desire
to see justice done, to enforce the law, to suppress crime, or to

punish the guilty) and as bearing on punitive damages (as illustrating the callous and reckless disregard of Bennett's rights).

The Court, overruled the objection and allowed the testimony, but then offered to the jury the following limiting instruction:

> Ladies and gentlemen, that testimony is admissible for one purpose only. Not for whether it is true that Mr. Lowrey intended to take the computers, or that Mr. Bennett, whom I believe the witness referred to as "Clyde," was too busy to notice. But it is offered -- it is being offered for the purpose for your consideration in assessing whether an investigation that did not talk to the dock workers, such as Mr. Spratley, was one in which a reasonable person could have relied in making the decision that R&L made.

Trial Tr. at 190:11-22. The Court then asked counsel if they desired "[a]ny other further . . . limiting instructions," and defense counsel said, "No, sir." Trial Tr. at 190:23 - 191:2.

The only further reference to Spratley was in Bennett's closing argument when counsel said:

> He [McGinnis] certainly could have taken the time to spend five minutes just touching base with each one of these other fellows [dock workers] and found Wayne Spratley. He didn't. Really not caring about justice. This case reeks of malice.

Trial Tr. 536:1-4. And that was merely a small part of Bennett's counsel's closing on the rush to judgment and how it was evidence of malice.

This issue was not raised in the Defendants' motion for a new trial. Instead, they presented it for the first time in their reply brief. The argument, therefore, is rejected as untimely.

Even if it had been timely raised, it is substantively without merit for two reasons. First, the evidence was admissible for non-hearsay purposes. It was probative of whether the Defendants engaged in a rush to judgment to convict someone (or as Bennett contended any one) and thus acted with a purpose other than to see the guilty prosecuted. It also was probative on the issue of punitive damages: whether, in their rush to judgment, the Defendants were callous and reckless in their regard for Bennett's rights in having arrested him without even looking for corroborative evidence to support the evidence given by the liars.

In retrospect, the limiting instruction could have stated those limited purposes more clearly. However, when offered the opportunity to tender any revision to it, counsel declined to do so. They cannot be heard to complain now that the instruction was inadequate.

Nonetheless, the Defendants did object to the admissibility of the evidence arguing that the determination of probable cause must be judged by what the Defendants knew when they had Bennett arrested. Of course, that is precisely what the jury was told in the final charge. (See J.I. 25, note 13, supra at p. 34). Neither at the conference on instructions nor when given the opportunity

99

after the instructions were given did the Defendants ask for a revision of the limiting instruction or argue, as they do in their reply brief, that the unrevised limiting instruction was confusingly at odds with the admittedly correct instruction on probable cause (J.I. 25). If they truly thought that was so, the Defendants should have sought a revised limiting instruction at the final charge conference or when given the opportunity after the jury was instructed, to ask for additional instructions or object to the instructions as given. It is too late now to raise the argument.[47]

Finally, even if admitting Spratley's testimony was erroneous, the error was clearly harmless. Rule 61 provides that no error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. See Fed. R. Civ. P. 61. In interpreting Rule 61, the

---

[47] At oral argument on the post-trial motions, counsel for the Defendants, Mr. Murov, addressed that forfeiture by saying "I don't know how you can object to it after it is given." Of course, that is done by lodging an objection to the given instruction or by asking for a revised instruction when given the chance to do so. In this Court, those offers are always made, and it is not unusual for counsel to lodge an objection or to ask for revisions. And, of course, a revised instruction could have been requested at the final charge conference.

Fourth Circuit has explained that "[t]he doctrine of harmless error expressed in Rule 61 is applicable to errors in instructions to the jury, and whether such errors are harmless or prejudicial depends upon whether substantial rights of a party are affected thereby." Smith v. Jefferson Cnty. Chamber of Commerce, Inc., 885 F.2d 866, No. 88-1765, table op. at 1 (4th Cir. Sept. 14, 1989) (quoting 7 J. MOORE, J. LUCAS, MOORE'S FEDERAL PRACTICE, ¶ 61.09, pp. 61-32-61-34)).

The objection made when the evidence was admitted and belatedly in the Rule 59 motion is based on the assumption that Spratley's testimony was admitted on the issue of probable cause. The assertion is that the limiting instruction had the effect of mischaracterizing the element of probable cause. Even if the limiting instruction could be so construed (which it cannot given its text and the way Spratley's testimony was used in Bennett's closing argument), the undeniable fact is that the proper instruction was given on probable cause. It is axiomatic that "instructions must be read as a whole, and a defect in one instruction may be cured by other instructions." 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2886 (2d ed. West 2010). Any error in the Court's oral limiting instruction to the jury was corrected beyond question in the Court's subsequent oral and written instructions to the jury related to the elements of the malicious prosecution claim. The jury properly considered these instructions and returned a reasoned

101

verdict against the Defendants. Hence, any error was harmless and does not warrant a new trial under Rule 59. Accordingly, the Court will deny the Defendants' motion for a new trial with respect to this issue.

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, the DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL (Docket Nos. 114 and 115) will be denied with respect to McGinnis and R&L; will be granted with respect to Finley and Bullard and judgment entered as a matter of law in their favor; and (3) will be denied with respect to the motion for a new trial, but with the punitive damages award remitted to comport with Virginia's statutory cap.

It is so ORDERED.

_____ /s/ _RE𝓅_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 3𝒟, 2010